CASE 58.—ACTION BY EDWARD WILEY AGAINST THE CHESAPEAKE & OHIO RY. CO. AND ANOTHER FOR DAMAGES FOR PERSONAL INJURIES.—June 18, 1909.

# Chesapeake & Ohio Ry. Co., &c. v. Wiley

Appeal from Woodford Circuit Court.

R. L. STOUT, Circuit Judge.

Judgment for plaintiff, defendants appeal.—Reversed.

1. Master and Servant—Injuries to Servant—Railroads—Broken Rails—Evidence—Rules.—Where a railroad employe, who was injured by derailment caused by a broken rail, claimed that the rail was probably cracked by being forced into a curved position, when cold, and the curve on which the rail was laid was from 2½ to 8 degrees, defendant's rule, requiring all rails for curves of 4 degrees and over to be properly curved before laid, was admissible.

2. Evidence—Opinion Evidence—Bodily Condition.—The opinions of expert physicians as to plaintiff's condition, based on objective symptoms and on a hypothesis submitted in questions propounded to them, are admissible.

3. Evidence—Opinion Evidence—Bodily Condition—Symptoms.—Physicians may describe the symptoms of a complaint in issue as given by accepted medical authorities.

4. Evidence—Expert Opinions—Permanency of Injury.—A physician may give his opinion as to whether plaintiff's condition is permanent or temporary.

5. Evidence—Res Gestae—Bodily Condition—Expressions of Pain.—Statements of an injured person as to pain and suffering or his bodily condition are admissible, if res gestae.

6. Evidence—Declarations—Expressions of Pain.—Such statements are admissible if they are the usual, natural and spontaneous expressions indicating present pain and suffering or if made to a physician while seeking medical assistance.

7. Evidence—Experts—Opinion—Hearsay.—Where an injured person goes to a physician, not for treatment, but to be ex-

amined that the doctor may testify as an expert in behalf of the party, the physician should not be permitted to express an expert opinion on subjective conditions and fortify it by stating acts of the injured person which could have been purely voluntary.

8. Appeal and Error—Prejudice—Evidence—Expert Opinion.— Where, in an action for injuries, none of the physicians testifying for plaintiff disassociated his opinion based alone on objective evidences as to plaintiff's condition from what he had received from plaintiff, which was purely hearsay, capable of being manufactured, and therefore inadmissible, the admission of such evidence could not be held without prejudice to defendant.

SHELBY & SHELBY and WALLACE & HARRIS for appellants.

SCOTT HAMILTON, D. T. EDWARDS and W. O. DAVIS for appellee.

OPINION OF THE COURT BY JUDGE O'REAR—Reversing.

Appellants Chesapeake & Ohio Railway Company and Louisville & Nashville Railroad Company use, under an agreement between them, the track of the Louisville & Nashville Railroad Company from Lexington, Ky., to Louisville, Ky. As one of the freight trains of the Chesapeake & Ohio Railway Company was going from Lexington to Louisville, and while near Spring Station the caboose and five or six of the cars on the rear end of the train were derailed. Appellee was riding in the caboose, which when derailed, turned upon its side and injured him. On the day before his right of action was barred by the statutes of limitations, he instituted this action. He alleged in substance, that appellants were negligent in the construction of their track at the point named and in failing to keep it in reasonably safe condition and repair, and that by reason of their negligence he received his injuries. A trial of the case was had near-

ly two years after the injuries were received, and the jury returned a verdict in his favor for $5,000.

The testimony shows that the derailment was caused by a broken rail, or rather by the breaking out of a piece of the ball of a rail. The witnesses vary as to the length of the piece of the rail that broke out, from eighteen inches to three feet. The rail consisted of a base, which rests upon the ties, next the web, and on top the ball upon which the wheels of the cars run. The rails are held together at the joints by what are called "fish plates," which are placed on each side of the rails and held in position by bolts passing through both the plates and the web of the rail; one-half of each plate resting against the web of each rail. There was testimony that there was an old crack in the rail at or near the break; but the witnesses differ as to the exact location of it. They all agree, however, that it was near the end of the rail and extended six or more inches beyond the end of the fish plate. Some of the witnesses stated that it started from the second bolt hole under the fish plate. Others say that it was above the fish plate; but all agree that it was in the web. They seem to agree that the crack was an old one as far as it extended in the web, but that the break through the ball was fresh. One of appellee's witnesses gave it as his opinion, judging from the appearance of the break, that it had existed for more than a month; and three or four of them, who had had considerable experience in railroading, stated that it would have been an easy matter for a person who was exercising ordinary care to have discovered this crack by sight or by tapping the rail with a hammer or some other metal substance. About

the same number of witnesses, also experienced in railroading, controverted this.

Appellee, for the purpose of showing the negligent construction of the track, introduced testimony to the effect that the rail which broke was originally a straight one, but had been forced into its position on a curve of more than four degrees in violation of the company's rules, and introduced a rule promulgated by appellant, which is No. 86, and is as follows: "Curving Rails.—All rails for curves of four degrees and over must be properly curved before they are laid in the track." The rail that broke was on a curve. Appellee's witnesses fixed it at from 5 to 8 degrees, appellant's witnesses at from 2½ to 3 degrees. Appellee's theory is that the rail was probably cracked by being forced, when cold, into its curved position, or that it was cracked by the weight of the heavy engines and trains after being put into the strained position, and that appellants were negligent in failing to discover the crack and repair it before the accident. The issues on these questions were submitted under clear, explicit instructions to the jury.

Appellants contend that it was error for the court to allow its rule referred to to be read to the jury, and cite the case of L. & N. R. Co. v. Gaugh, 118 S. W. 276, the opinion in which was delivered April 22, 1909, as sustaining them. The principle established in that case is not applicable to the case at bar. Appellee in that case was a mere pedestrian using the streets of the city. She was not connected with or using the railway property in any sense. In the case at bar appellee was an employe of and using the tracks of appellants in the discharge of his duties, and had a right to show that the road was improperly and neg-

ligently constructed. The rule which was introduced tended to show an admission of appellants that, in order to make the road reasonably safe on a curve of more than four degrees, it was necessary to curve the rail before putting it on the track. It has been so often decided by this court that the rules governing the conduct of a business may be read in a suit between the employer and employe by either party when the injured party is suing to recover for injuries inflicted because of the violation or nonobservance of the rule, and was himself in a service and performing work in the sphere of the operation of the rule, that we deem it no longer an unsettled question. See cases of L. & N. v. Hilter, 60 S. W. 2, 22 Ky. Law Rep. 1141; L. & N. v. Scanlon, 60 S. W. 643, 22 Ky. Law Rep. 1400; L. & N. R. R. Co. v. Gilliam's Adm'x, 24 Ky. Law Rep. 1536, 71 S. W. 863; I. C. R. R. Co. v. Stith's Adm'r, 120 Ky. 237, 85 S. W. 1173, 27 Ky. Law Rep. 596, 1 L. R. A. (N. S.) 1014; Cincinnati, N. O. & T. P. Ry. Co. v. Curd, 89 S. W. 140, 28 Ky. Law Rep. 177; Alexander v. L. & N. R. R. Co., 83 Ky. 589, 7 R. 621.

Appellants contend that appellee was not injured to any considerable extent and that he was allowed to introduce incompetent testimony to show the extent of his injuries. This is the real question presented on this appeal. The evidence tends to show: That, when the caboose was derailed and turned upon its side appellee was thrown from his position therein on the right-hand side of the car to the other side near the end of the car and against the wall; that he was unconscious for a few moments; that as soon as he recovered he found himself in a lot of debris and thought of the fact that it was his duty to flag another

freight train that was following; that he managed to get out of the caboose and go back on the track for about 150 yards, at which point he became dizzy and sick, sank upon the track, and the conductor of his train and some other person carried him back to the caboose and made a bed for him with the cushions. He was soon afterwards carried to his home in Lexington where he remained in bed for 15 or 18 days under the treatment of a physician, Dr. Scott, and after he was able to get out of the bed he remained under the treatment of the same doctor for several months. For a while the doctor called at his home to see him. After that appellee went to his office. The doctor finally advised him to go to the Chesapeake & Ohio Railway Company's hospital at Clifton Forge, Va., which he did, and remained there under treatment for a short time, returned home, and again placed himself under treatment of Dr. Scott. At about this time he claimed his spinal column became curved to one side, and the doctor cauterized him for the purpose of relieving him. Appellee took all the exercise possible, under the directions of his physician. He hunted and fished some; but he had not performed any manual labor since receiving his injuries. Appellants claim that appellee's injuries are not as severe as he insists they are. In testifying to the effect and extent of his injuries, appellee said, in substance: That he had suffered pain all the time since he was injured in the region of the small of the back and from there down to the end of the spinal column. That there were tingling sensations passing from that point down his limbs. That he lost use of one of his legs; it becoming paralyzed for about 15 days in the month of April or May after he received his injuries in November. That he had severe pains in the back of his head once

or twice each month. That he had no such afflictions before he was injured. That his back had been stiff. That he could not bend forward or backward. That the only way that he could reach anything on the ground was by bending his knees and reaching down from his left side. That he could scarcely walk up or down stairs or up or down a steep incline. That he could walk on fairly level ground, but that it was much discomfort to him. That he had not been able to perform manual labor at any time since he received the injuries. That he had not been able to sleep well at night. That he often had no appetite. That when he fished and hunted, or moved about, it was with great pain. Three physicians, appointed by the trial court to examine the plaintiff, testified in substance that they had made a thorough examination of him and could not find any cause or defects which could produce the ailments he complained of. Appellee introduced three physicians who testified that they had made a thorough examination, and that they found causes which produced the trouble he complained of, and it is of the incompetency of their testimony that appellants complained. Neither of them treated him for his injuries. They examined him for the purpose only of ascertaining if he had been injured, the extent and probable cause thereof, so as to qualify themselves to give testimony in his behalf concerning his injuries. The effect of their testimony was: That they found upon examination that two bones of the spinal column in the lumbar region united so that they prevented him from bending either forward or backwards; that the nerves and muscles in that region were injured and sore, and slight pressure on them gave him great pain; that they could detect this by the expression of pain

shown in his face when they pressed upon one of the
nerves; that there was a bare possibility that he
could have deceived them; that he did not know where
the nerves were, and, of course could not tell when
they pressed upon one, except from the pain; that they
thoroughly tested him upon this point.

The testimony of Dr. Wallace, a physician and wit-
ness called by the appellee, contains this matter: "Q.
Now, Dr. Wallace, tell the jury, with as little technical
verbiage as you can, in English, that the jury and I
can understand you, what condition you found Mr.
Wiley in when you examined him, when you made the
examination last January? A. Well, I found him with
what doctors call a partial ankylosis of the lower part
of the backbone, two bones in the spinal column above
the hip, and a general soreness and tenderness all
over the lower part of the backbone, clear on down to
the end of it. That caused a great deal of pain on
pressure over those bones, and in the muscles about
and around for a considerable distance. He had evi-
dence of what we call neurasthenia, which are various
symptoms, resulting from some disorder of the ner-
vous system, which I will try to make plain to you,
such as headache, constant headache, not able to sleep
at night, frequently called insomnia— Q. Mr. Wal-
lace, Did you get that statement from Wiley, about
the headache? A. Yes. Mr. Shelby: We object to
that, if the court please. We desire to save an ex-
ception to that statement. A. Shall I state what the
patient complained of? The Court: Yes, go ahead.
Mr. Shelby: The defendants object and except to
the statements of the witnesses as to the declarations
made by the plaintiff to him at the time of the exami-
nation of the plaintiff by the witness. A. Well, he
had constant headaches, wakefulness, not able to sleep

well, startings in his sleep like a child. He was troubled with wakefulness, I said, startings in his sleep, not able to sleep well, starting as if he was frightened, like a child, nervous troubles at night, and a constant feeling of fatigue in his leg, the general symptoms of what we call traumatic neurasthenia, which is due to a wound or lesion of some kind. Then I found that he was also troubled with what doctors call neuritis. That is an inflamed condition of the nerves, an inflammation of the nerves that leave the lower part of the backbone, which interfered with the movements of his right limb at that time, and then he had feelings of numbness and twitchings of his muscles in both legs. (Defendants except.)''

On cross-examination this witness said: ''Q. Did he come to you for the purpose of having an examination made, or to employ you as a physician to treat him? A. No, he came to me for this advice, told me that there was some prospect of a suit, of the determination of a suit, and he wanted my opinion as to his disability, how badly he was hurt, and whether it was permanent or not. Q. Did he come to you for treatment? A. Not at all. Q. You didn't see him any more after that time until your examination of him this week? A. No, not in a professional way. I met him on the street once or twice. Q. How long did this examination last that you spoke of, in January? A. Oh, some little bit. I could not say that. I went over him very carefully. I will say that. I don't know how long it was, I couldn't remember that; but I was very careful about it. Q. Was he stripped? A. Yes, sir. Q. Did you discover any evidences of fracture? A. None. Q. Discover any visible bruises, or lacerations, or anything of that kind? A. None; no, not on the skin. Q. Now, you spoke of

some evidence of ankylosis, or stiffening in some of the lower vertebrae? A. Yes. Q. The two lower? A. The lumbar vertebrae, the two lower vertebrae where it joins the sacrum, that large triangular bone between the hips. Q. How did that condition manifest itself in the examination? A. In the movements of his body, and with my thumbs on what is known as the soft spinal vertebrae, the lateral processes, giving pressure there, I could feel and see that there wasn't the usual motion, bending of the back and contortions in various uses. Q. It didn't seem to move as freely as the other? A. No. Q. You didn't see anything in that condition, of those two lumbar vertebrae, to indicate to you that was a permanent condition at that time, did you? A. When? Last January? Q. Yes. A. No, I didn't at that time. Q. Now, as to—You say you discovered evidences of soreness to the touch? A. Yes. Q. That was manifest, I suppose, by flinching? A. Yes, sir. Q. That was the only way in which it could be manifested to you? A. Yes. Q. Of course, you couldn't tell it by the touch yourself? I mean, your own sense of touch would not have disclosed the soreness to you, but it was flinching under your touch. A. In a particular region, under pressure of my thumb— Q. When you pressed, he would flinch? A. In certain places. Q. Now, will you— You stated you saw what was to your mind evidences of a neurasthenic condition? A. Yes, sir. Q. It is a fact that neurasthenia means simply an impairment of the nerve forces? A. Yes, sir; what is known as nerve fatigue, or tired nerve. Q. Just nerve tiredness? A. Yes, sir; nerve tire and nerve irratability. Q. And traumatic neurasthenia is that condition of nerve fatigue that is the result of a wound or an injury? A. Yes, a blow or an injury or a twisting

in various ways, of the nerve. Q. Now, this neurasthenic condition, or nerve fatigue, may come from other causes than traumatic causes? A. Yes. Q. And the symptoms are the same, unless you have the history of some injury? A. Practically the same. Q. Practically the same. In other words, nerve fatigue has the same general symptoms and the same general manifestations, whether it results from an injury or whether it results from other causes? A. I have always thought, in cases that I have seen, that in traumatic neurasthenia there is more of general irritability than in other cases, more general irritability, the man is more irritable, and there were evidences of a more general disturbed condition than I saw in purely functional neurasthenia; that is using that term, not due to injury. Q. That condition of nerve irritability is called neuritis? A. No, sir; neuritis is an entirely different thing from neurasthenia. Q. I was talking about the irritable condition of the nerves. A. I was speaking of the general irritability of the patient in a general sense, as seen by the doctor. I wasn't applying it to the nerve, Mr. Shelby, in a general way. Q. Now, is it not a fact that all the symptoms which go to enable a doctor, as a rule, to diagnose a case as one of neurasthenia, are they not subjective symptoms as a rule, his subjective symptoms? A. Yes, sir. Q. And the doctor is dependent upon the statements of the patient as to his feelings and symptoms? A. No, sir; not altogether. Q. I didn't say altogether. A. I generally take a general statement from the patient. Q. I understood you to say, in enumerating the symptoms which led to diagnose his condition as one of neurasthenia, that the headache symptom was one? A. Yes. Q. Insomnia was one? A. Yes. Q. Starting in his sleep? A. Yes.

Q. Loss of appetite? A. Yes. Q. Sensation of fatigue? A. Yes. Q. All of that you had to get from his statement, did you not? A. Yes. Q. That opinion of yours was based upon the statement of those symptoms as having existed anterior to this examination? A. Yes."

Dr. Neely, another physician called as a witness for the plaintiff, testified in chief, in part, as follows: "Q. Now, Doctor, will you please tell the jury, with as little technical verbiage as you can express yourself with, the condition in which you found Mr. Wiley when you made the first examination of him several months ago? A. Well, he came to my office several months ago, and I examined him. I found that he was suffering with pain in the back, and, of course, he told me what produced it. Q. No matter what produced it. Just give his condition. A. Well, he was suffering with considerable pain; that is, not complaining so much of an acute suffering except upon pressure. I found upon pressure and examination a great deal of pain, from the lower portion of his spine clear down to the end of the spinal cord, what we term—next to the sacral region, the region of the sacrum, involving all the sacrum and the coccyx bone; in other words, to the small of the back. Q. Down to the end of the backbone? A. Yes, sir. Q. What general condition of the back and spine did that produce, Doctor? A. Well, it seemed to have produced a very rigid condition of the bony structure. In having him bend over I found that he could not bend like an ordinary man. Q. Now, when you say 'rigid condition,' Doctor, do you mean a stiffening of the parts? A. Yes, sir; and that resulting in my opinion, in congestion of the spinal cord, brings about and produces the various symptoms that he com-

plains of, with a partial paralysis, and a tingling, pricking sensation of the muscles. Q. Doctor, you stated that he was unable to bend forward as the ordinary man. How could you tell that he was unable to bend forward, independent of his own assertion to that fact? A. Well, I don't think that I could tell, except seeing him make the effort. I don't know that he knew my object in asking him to do it. I didn't use the X-ray on him. I wanted to do it; but my main object was to ascertain if there would be any way of getting at the amount of trouble in the spinal cord, and the doctor who had the X-ray machine said that it would be no good to use it, that he couldn't tell anything about it. Q. Could you, Doctor, and did you, ascertain from your examination, by your observation of the parts and your touch of the parts you examined, that this stiffness was there independent of his assertion to that fact? A. Well, I thought so, in my opinion, I thought I could find enough to satisfy me that there was practically no motion, and there is but slight motion in that except right where what we term the lumbar region, the sacral region, right at that joint, from that down to the coccyx, there seemed to be absolutely none, scarcely. Q. Doctor, the condition you found that was abnormal, would that have produced the complaint that the patient made to you? Mr. Shelby: We object. Leading. Q. State, Doctor, what results or complaints would have been produced by the abnormal conditions that you found? A. Well, I would suppose that I would find about the same set of symptoms that he complained of. (Objected to. Overruled.) * * * Q. Doctor, you have stated that, when you made this examination, you found that the patient was suffering from pain. How did you determine

that?    A. By pressure upon the tender points of those processes.  Q. The points upon which you gave this pressure, was there any visible condition of those parts that indicated that they were abnormal? A. Except only—just one particular spot.  I don't know for certain that had anything to do with it or not. There was one particular place in the small of the back that seemed to have shrunken in more than the others, that the muscle was atrophied a little. That, of itself, I don't think would be sufficient; but all the symptoms that he complained of would lead you to believe that he not only had some kind of injury— I don't know what he owed it to—but sufficient to have produced this condition of the spine that we find it in, that rigid condition, and also the congestion of the spinal cord.  Mr. Shelby: We move, your honor, to exclude that last statement of the witness from the jury.  (Which motion is overruled; to which ruling of the court defendants except.)  * * * Q.  Yes, sir. Well now, Doctor, I will ask you if any—did you trace the nerves that run from the backbone down into each limb with the touch?  A. Well, I don't know that I traced them except in his general description of how it affected him, commencing from where he had received the injury, going down each limb, affecting the sciatic nerve more or less.  (Defendants except.)  Q. Independent of his statement to you of his suffering did you undertake to touch the nerve in its course from the backbone down the limb to ascertain whether or not it was tender?  A. No, I don't remember whether I did or not, but that was his own description of it.  I suffer with sciatic trouble myself, and so I was satisfied that he knew what he was talking about.  (Defendants object.  Overruled.  Except.)''

It is not contended that Dr. Neely examined the
plaintiff for the purpose of giving him medical treat-
ment, or professional advice. The only purpose of
his examination, so far as is disclosed, was to qualify
the doctor to speak in plaintiff's behalf as a wit-
ness.

Dr. Prather is the third of the physicians called
for the plaintiff. His testimony, in full, was as fol-
lows: "Q. Where do you live? A. I live in Lexing-
ton. Q. What is your profession? A. I am a physi-
cian. Q. How long have you practiced medicine? A.
Twenty-two years. Q. General or special practice?
A. General practice. Q. Do you know Mr. Ed. Wiley?
A. I do. Q. Have you at any time made an examina-
tion of Mr. Wiley to ascertain what injury, if any, he
has? A. Well, about three weeks ago, I made an ex-
amination of Mr. Wiley for the first and only time. Q.
Where? A. In my office. Q. Lexington? A. Lexing-
ton. Q. Tell the jury, Doctor, what was the extent
of that examination, and what was the result of it, as
to the condition you found him in? A. The only thing
I know about the case was this examination I made
about three weeks ago. I found a partial ankylosis
of the lumbar vertebrae, with the sacrum and the
coccyx bones. Q. Explain to the jury, Doctor, what
ankylosis is? A. It is stiffness of the joints, and a
stiffening of the vertebrae, with lack of motion. Q.
Does not that stiffening cause a lack of use or—A.
Lack of use? Q. Of the back? A. Yes. Q. Did you
make only that one examination of him? A. That's
the only one I made. Q. Now, Doctor, could that con-
dition which you found have resulted from a blow or
a wrench of the backbone? A. Yes, sir. Mr. Shelby:
We object. Q. Without any visible indication of a

wound or abrasion? (To the foregoing question defendants, by counsel, objected. Objection overruled. Defendants except.) Q. Now, the question, as a whole, that I ask you, was: Could the condition you found have resulted from a blow upon or a wrenching of the backbone, without any visible indication of a wound or abrasion? (To which defendants except.) A. I think the condition could have existed from a wrench or from a blow. You know, I have not seen him at all. I think he claims he was hurt two years ago. I think the blow would have given some special signs at that time, at least. Q. Did you make any examination of his limbs? A. Well, not specially. He complained of a good deal of tingling and numb feeling in his limbs. (To the foregoing statement of the witness as to the complaints of the patient, the plaintiff, made to the witness, the defendants except.) Q. That would have resulted from the injury you found? A. Yes, sir; I think so. Mr. Wallace: We object and except. Q. Doctor, in your judgment, from your examination and the condition in which you found his back and the parts that you did examine, is that injury a permanent or a temporary one? A. Well, it seems to me, from the fact of its long standing, it must be permanent. (To the foregoing statement of the witness, the defendants, by counsel, object. Objection overruled. To which ruling of the court the defendants except.)''

Cross-examination by Mr. Wallace: ''Q. Doctor, do you know how long standing that condition was except from what he told you? A. I do not. Q. So, then, your opinion as to its being permanent injury depends entirely on what he told you? A. On what he told me, the history of the case; yes, sir. Q. The time of the injury— Well, do you mean that because

it has lasted from the time that he told you it occurred up to this time that it is permanent? A. I didn't understand. Q. Do you mean it is a permanent injury because it has lasted from the time he told you it occurred up to the present time? A. Do you believe— Q. Do you mean it was a permanent injury? A. Yes, sir; from the condition that I found his spine, column there, the sacrum— Q. Did you examine him with the X-ray? A. Did not. Q. Treat him? A. Did not. Q. Strip him? A. Yes, sir. Q. Any visible signs of the injury? A. None that I could see. Q. None that you could see. All, then, that you know about it, is what he told you of the symptoms? A. Yes, sir; and the condition of the spinal column. He couldn't bend himself over with the motion that he should have had. The sacrum showed a great deal of tenderness. Q. Did he indicate how much motion he had, show the amount of that? A. He gave me a history of the case, that he was— Q. Didn't he tell you how much motion he had? A. Certainly. Q. Did you treat him? A. I did not. Q. Did he come to see you to be treated? A. No, sir. Q. Did he come to see you that you could testify in this case? A. Not—no, sir; not that I know of. I am the examiner for a brotherhood of railroad trainmen, firemen, and so forth. It seems that he had a policy in one of those companies, and he came to me to be examined. I didn't know that he had this suit pending. Q. When was that? A. About two weeks ago. Q. When were you summoned as a witness? A. Why, I was summoned a few days ago. I believe it was the second or third day of the week."

Drs. Wallace and Neely testified to having found by their physical examination of the plaintiff an ankylosis of the backbone, a stiffening of its lower part. They also testified as to the general symptoms of

neurasthenia, and traumatic neurasthenia, as well as testified, in response to hypothetical questions propounded by plaintiff's counsel detailing the symptoms which plaintiff in his testimony claimed to have had, that those symptoms indicated neurasthenia, and might indicate traumatic neurasthenia. What these witnesses said, based upon objective evidences of the plaintiff's condition, was relevant, as well as their opinions based upon the hypothesis submitted in the questions propounded them. Their description of symptoms of that complaint given by accepted medical authorities were also relevant as testimony. Their opinions were also relevant concerning whether the plaintiff's condition was permanent or temporary. The important question in the case was whether the plaintiff was in the physical condition claimed by him. There was nothing in his appearance to indicate it. A close, careful, professional physical examination of his person disclosed this situation: Three of the examiners were unable to say that they found any evidences of physical impairment. Three thought they could discover them; but the latter were not willing to say, and did not say, that independent of the statements made to them by the plaintiff; and independent of his muscular demonstrations in their presence in the course of their examination, that what they found upon an examination of his lumbar regions was of a serious nature, or would of itself impair his ability to labor, or cause him pain. Ankylosis of the backbone, if it existed, would not necessarily, or even probably, alone produce neurasthenia. It does not seem to a lay mind that a stiffening of a joint in the body, and an impoverished state of nerves have any necessary relation. Nor are we enlightened upon the subject by the testimony of the professional

gentlemen who appeared in the case. Whether there was a stiffening of the backbone was left to depend entirely upon the statements of the plaintiff. The doctors said he could not bend forward nor backward, nor sideway, except to one side. They said the plaintiff, when asked to bend, responded that he could not without pain, and after an apparent effort gave it up. So, after all, the question was left to the plaintiff. So much for that ailment. Now, as to the impoverished condition of his nerves, it was even more dependent upon the plaintiff's statement of facts, than the other trouble, for its discovery. The testimony was that the plaintiff appeared in good health, that he looked well, that he had gained in weight, and had a florid complexion. It was the testimony of some of the doctors that one might have that appearance and still be a neurotic, but that it was exceptional. The symptoms which the plaintiff claims to have, and which the doctors say indicate neurasthenia, are insomnia, loss of appetite, numbness in the limbs, a sensation like pinpricks in the skin, lassitude, undue apprehensiveness, a certain contraction of the circle of vision, and a dizziness, accompanied by more or less pain in the head. Now all, or nearly, by the observation, at least, they are not easily discoverable. All these are not discoverable upon an examination made at one sitting lasting for a short while. There are certain tests which it is claimed will show their existence or absence; but it is generally essential to the validity of those tests that the patient be unaware of their object or application. They must act independent of the will of the patient, to have any probative force.

This much has been said, not to criticise the conduct of the plaintiff, nor to imply that he was malingering;

nor to intimate that his statements are either unbelievable, or that they alone may not be sufficient to base a recovery upon if the jury should consider that his condition is as he claims it is; but to set forth the legal question presented for our decision, which is the relevancy of the statements and conduct of a party, not under oath, testified to by another in his behalf. It is a familiar rule of evidence that statements of a party not under oath and which are favorable to his cause, are not receivable. They are deemed self-serving, and are known to be unreliable evidences of the truth in general. His conduct of the same character, done for the same purpose, is, for the same reason, not receivable in evidence. The question is not whether what he said was true, or whether what he did was a natural, unstudied act, but whether the principal fact may be proved in that way. Illustrating by the same case at bar, the plaintiff was sleepless, nervous, weak, and had pains, might all be proved, the question is, how? Hearsay evidence is generally irrelevant; but there are many exceptions to the rule. The exceptions are in the main based upon the experience of jurists as well as of men in general that in the particular matter the statement was made under such circumstances as warrant a belief in its truth. One of the exceptions to the general rule is that in a case where pain, or a state of health, is a fact at issue, the natural, spontaneous, and usual expressions indicating pain and suffering may be shown, as generally that is the only way in which, aside from the testimony of the sufferer, the existence of pain may be proved. So of other mental states; but it is the invariable rule that the expression should accompany immediately and naturally flow from the

pain then being suffered, otherwise it becomes a narrative of a past event, and is not receivable in evidence in court to prove that the pain had existed. Such expressions or manifestations of pain or any mental state which is at issue in the case may be shown by any observer, whether physician or not. Another exception is, though it belongs to the same class, where one suffering from an ailment seeks medical assistance or advice, it is competent to show what he then told his physician as to his symptoms, but never as to the cause of an injury (Shade v. Bridge Co., 119 Ky. 592, 84 S. W. 733, 27 Ky. Law Rep. 224), because it is believed that the motive for telling the doctor the truth as to his sensations of pain, suffering or history of his ailment, so as to enable the doctor to relieve the suffering, or save the life of the patient, is greater than could be the motive of making a merely self-serving statement to be used in his behalf by the man in some other affair. This allows more than if the same statement had been made to one not a physician or nurse, from whom the patient was expecting aid or physical relief, because in the instance of the physician or nurse there is present a motive for telling the truth that is not present when the same matter is told to one from whom the relief is not sought. If the act or statement is the natural, ordinary, and probable expression of one in that condition, it is deemed to be probably true, and is receivable as evidence of the state which it indicates, and because from the nature of the matter it may be the only evidence of the fact. There is another ground upon which the evidence of the character discussed (that is exclamations indicating pain, or emotion, and declarations as to sensations, as well

as the conduct of a person whose pain or sickness is at issue) is receivable; that is, when it is part of the res gestae. If it is relevant to show the physical condition of the person, such as that he was injured or made sick, not only what a witness has seen and testifies to is relevant, but the exclamations or statements of the person which are the natural spontaneous expressions ordinarily made by one who suffers such pain or illness, are receivable as verbal acts; and upon the same principle, his actions, such as naturally and spontaneously result from such injury or illness, may be proved. They are the best evidence obtainable of his condition, and in many instances the only evidence of it aside from his own testimony, should he testify. They may be even more convincing evidence of the main fact than the opinion of an observer, or even the opinion of the declarant himself.

But the proposition involved in the ruling of the learned trial judge in admitting the evidence, of the class which has been quoted in this opinion, is whether the exception to the general rule of evidence which excludes hearsay is so broad as to include the statements and conduct of the party made not under the conditions which have been discussed above. There is not a unanimity among the authorities on the subject, and, so far as this court is concerned, the precise question has never before been presented to it. It is proposed by those advocating the admissibility of such evidence to rest it upon the ground that it is all of the same class, and is to be regulated alone in its application by the jury, who give it such weight as they deem it entitled to. The same argument extended would let in every self-serving statemen' made by one in contemplation of its effect upon his

lawsuit. The cunning and venal would be afforded
extraordinary opportunities for multiplying their
own statements, and gain for them some additional
weight by the character of the deponent who repeated
them, with more or less mixture of relevant fact. Self-
corroboration under such circumstances would soon
cease to be novel.

The competency of witnesses has been greatly ex-
tended in modern times by legislation. The tendency
of courts has been in the same direction of liberality.
More and more has been left to be determined upon
the credibility of the witness; but there has not been
any relaxation of the rule against hearsay evidenc·
Nor has the scope allotted to the field of opinion evi-
dence been materially enlarged. Hearsay evidence
has been always regarded as generally untrustwor-
thy, while opinion evidence is placed low in the scale,
and receivable at all only because there seems ɪ
other practicable way to establish the fact. It is
doubtful whether its service to the cause of justice in
ascertaining truth entitles it to any great confidence.
The proposition now in hand is to extend the scope
of hearsay evidence, and to allow opinions based upon
it to be received as evidence of the main fact. The
tendency of each would be to dilute the strength of
proof. Each is a degree further removed from what
is called "the eyewitness." The issue is whether a
plaintiff was sick. He testifies under his oath
that he was, and gives the symptoms of his ail-
ment. All that is relevant. Out of court he complains
of symptoms to his companions; he staggers, grasps
for something to stay his falling; he vomits; he turns
pale; he exclaims of pains in particular regions of his
body; he swoons; his muscles relax; the pupils of his
eyes dilate; a cold clammy sweat appears on his body,

he limps when he walks; his speech is inarticulate, or disconnected—all these, and such, are admissible to prove the fact at issue. He calls a physician to administer to him; he explains to the doctor the sensations, present and past, which he has experienced in the attack—what is called a "history of the case;" the physician notes his pulse, his respiration, his temperature, the objective and subjective symptoms of the patient—from all these he is able to diagnose his trouble, and to prescribe for it. Not only what the doctor observed, but what he was told by the patient as to his sensations and symptoms, and his own opinion based thereon, are receivable as evidence of the fact at issue. Others saw the man, noted his appearance and conduct, and heard his complaint or exclamations, under such circumstances as indicated they were spontaneous, natural, and unstudied actions and utterances of the person. All that is receivable as evidence of the fact at issue. So all the authorities agree. It is needless to cite them.

Now it is proposed that the rule be further extended, that a physician selected by the party for the sole purpose of procuring his testimony on the trial of a lawsuit may be told by the party what his past sensations and symptoms were, or what they then are, and to have the doctor, upon that evidence, which would not be receivable as evidence in court, base an opinion as to the cause and probable duration of the party's ailment, and give in that opinion as evidence that he was then or had been afflicted with that ailment. How a party acts under such circumstances is not on a different plane from what he says. A nod, a jerk of the hand, the wink of an eye, or the mobility of a leg under pressure, may all be the voluntary result of the will, as much as the spoken word, and be

actuated by the same motive. All subjective evidence furnished by the patient under those conditions is on the same plane.

Many authorities have been cited and examined, and will be found in the notes of the reporter. We do not cite from them, as any one desiring to test the accuracy of the reasoning by which we undertake to sustain our conclusion, and the character of the authority which we follow, will have recourse to the whole of each case, and more satisfactorily note its appositeness; but the language of the Supreme Court of Illinois, in the recent case of Greinke v. Chicago City Ry. Co., 234 Ill. 564, 85 N. E. 327, so clearly expresses what we deem not only the prevailing rule, but the better reason, that we take from it this extract: "No such safeguards, however surrounded him when he is being examined by an expert whom he has employed to examine him and to give evidence in his case which is about to be tried in court. To permit the injured party, while undergoing an examination by an expert in his employ, by jerks and twitches, by a pressure of his hand, by turning his toes, or dragging one of his legs when walking, to thus make evidence for himself, and then to permit his expert to go before the jury and bolster up and strengthen by his opinion the self-serving testimony thus manufactured by the injured party, would open up the door wide for the grossest fraud, which might work upon his adversary the most palpable injury. The character of self-serving testimony has been held incompetent by the Supreme Court of Michigan in McKormick v. City of West Bay City, 110 Mich. 265, 68 N. W. 148, and Comstock v. Georgetown Township, 137 Mich. 541, 100 N. W. 788, and the general rule announced

by that court is, we think, in entire harmony with the ruling of this court in the numerous cases hereinbefore cited, and is the correct rule and the one most conducive to justice. We do not intend to hold, however, that a physician may not be able, from an examination of an injured party, to form and express an opinion as to his physical condition and the probable cause which induced such condition, based upon objective testimony alone; but what we do intend to hold is that a physician who has not treated the injured party, but who has made an examination of the injured party solely with a view to testify as an expert, should not be permitted to express an expert opinion to the jury based upon subjective conditions, and then be allowed to fortify his opinion by stating to the jury acts of the injured party which could have been purely voluntary and under the control of the injured party, and which may rest upon no other basis than the truthfulness of the injured party."

Three physicians were appointed by the court to examine the plaintiff for the purpose of testifying as to his condition. If they are distinterested men, such expert witnesses have not the same inducement for bias as they would have if chosen by a party. However, that would seem to go to their credibility alone. When they examine the party physically, of necessity they must observe what he does in apparent response to their tests. If the party is endeavoring to deceive the examiners, he may simulate pain, or involuntary muscular action. In so far as the tests of the examiners have resorted to the subjective, they do not seem to be on a different footing than if the examination was made by a physician of the party's own selection. Of course, if they resort to subjective or

objective tests, and from them are able to say that the party was simulating, they may state both their opinion and the fact on which it is based, for that would be receivable under another rule of evidence, to-wit: An attempt by a party to fabricate evidence in his behalf is receivable as evidence against him. It has been urged upon us by appellee that the evidence complained of, though erroneously admitted, was not prejudicial, that some of the cases holding to the rule which we adopt so held. Whether evidence erroneously admitted is prejudicial in a given case must necessarily depend upon the record of that case. Inasmuch as none of the physicians testifying for appellee in this case dissociated his opinion based alone upon objective evidences in the patient as to the plaintiff's condition from what he had received from the plaintiff of a character which we have held was erroneous, it is impossible for us to determine what their testimony would have been independent of the plaintiff's action and statements. It would strip the plaintiff's case of the most material part in value and quantity of his evidence to exclude the opinions of these physicians entirely. Not only can we not say that the evidence appears unprejudicial, but it seems more than likely that it was.

Judgment reversed and cause remanded for a new trial consistent herewith.