## Agsten et al. v. Brown-Williamson Tobacco Corporation.

(Decided Feb. 8, 1938.)

JOSEPH SOLINGER and ELI BERRY for appellants.

ROBERT F. VAUGHAN for appellee.

OPINION OF THE COURT BY JUDGE REES—Reversing.

Walter J. Agsten, an employee of appellee, Brown-Williamson Tobacco Corporation, received an injury in the course of his employment on August 2, 1934. He died September 24, 1934, and his widow, Ethel V. Agsten, filed a claim for compensation with the Compensation Board. The company resisted the claim on the ground that Agsten's death resulted from a disease not caused by, or connected with, the injury. The board found that Agsten came to his death as a result of a traumatic injury received by him in the course of his employment, and awarded compensation to his widow at the rate of $11.70 per week for a period of 335 weeks. The employer filed a petition for review in the Jefferson circuit court, where the award was set aside on the ground that there was no competent evidence of probative value to support the finding of the board. From the judgment setting aside the award, the claimant has appealed.

It is conceded that Agsten was injured August 2, 1934, and was given first-aid treatment by the company's physician, Dr. Ira N. Kerns, who continued to treat him until August 17, when he sent Agsten to Dr. George E. Vaughn, an eye specialist. Dr. Vaughn found that he had decayed teeth, and sent him to a dentist. On August 21, 1934, Dr. S. D. Thompson, a dentist, extracted two teeth, and on August 24 extracted a third tooth. At the hearing before the Compensation Board, the parties stipulated certain facts, among them the following:

> "That on August 2, 1934, Walter J. Agsten sustained an injury by accident arising out of and in the course of his employment at the plant of the defendant, viz., while checking hogsheads, his foot slipped from the loading platform, causing him to fall between the platform and the railway car, striking his left hip and elbow, resulting in contusion of elbow and hematoma (bruise) of the hip."

A certified copy of the certificate of death was made a part of the stipulation. Dr. D. E. Abraham, the attending physician, signed the certificate which gave "hypostatic pneumonia" as the principal cause of death, and "endocarditis complication" and "streptococcus infection of blood stream" as contributory causes. All the physicians who testified stated that the hypostatic pneumonia and heart trouble were caused by the streptococcus infection. Where they disagreed was as to the source or the cause of the infection. Some attributed the infection in the blood stream to the extraction of the teeth on August 21 and August 24, and others attributed it to the traumatic injury received on August 2. If the injury caused the streptococcus infection, then it is compensable. Kentucky Statutes, sec. 4880; Great Atlantic & Pacific Tea Company v. Sexton, 242 Ky. 266, 46 S. W. (2d) 87.

The dispute narrows to the single question: Was there any competent, relevant evidence having probative value tending to support the board's finding of fact that the blood stream infection which caused Agsten's death resulted naturally and directly from the traumatic injury? If such evidence was produced, the circuit court erred in setting aside the award.

"In determining a question of fact the Workmen's Compensation Board is not limited to direct evidence, but like other tribunals may consider all the circumstances."

Diaz v. U. S. Coal & Coke Company, 270 Ky. 565, 110 S. W. (2d) 290, 292.

The proof shows that Agsten was apparently in good health prior to the accident August 2, 1934. He continued to perform light work until August 21, 1934, but during that period complained of pains in his injured leg and the back of his head. There was some proof that he had chills and night sweats about ten days after the accident and about a week before the extraction of his teeth. Dr. D. E. Abraham first examined Agsten on August 22. He saw him again on August 29, and frequently thereafter until his death On September 14, Agsten was taken to the Kentucky Baptist Hospital, where he remained until September 24, when he died. The attending physicians suspected an infection

of the blood stream, and on September 23 a specimen was taken from which Dr. John Allen, a physician and surgeon who specializes in bacteriology, isolated an organism known as "streptococcus viridans." A number of physicians who testified for the company stated that the germ known as streptococcus viridans is usually present in the mouth, and that its entrance into the blood stream is possible only through some aperture, and that the extraction of teeth affords the opportunity for such entrance. They stated that they had never known an instance where this germ entered the blood stream at any point in the body except the mouth or throat as the result of a traumatic injury, but did not state that the entrance of the streptococcus viridans into the blood stream as the result of an injury is impossible. Five physicians testified that streptococci viridans are usually present in the body, and that they colonize and incubate in weakened areas. Dr. Abraham, after stating that the streptococcus viridans usually is found in the mouth, although it may be found in other places, said:

> "As stated before, there are some of the germs floating in the body at all times, and if you have a field such as hematoma which they will feed on—you have warmth, moisture and food for them, it makes one of the best incubators you can get—you can get any kind of an infection through hematoma."

From his observation of the decedent and the history of the case, he expressed the opinion that the streptococcic infection resulted from the injury. Dr. Simrall Anderson stated that a hematoma such as the one received by the decedent was "the most fertile field in the word" for streptococci. In answer to a hypothetical question, he said:

> "Well, from the history, and from the reading of the post-mortem, and from the pathological report —I can not see that there is anything in this case but the streptococcus infection, due to this injury to the hip, and that's the only thing you can make of it. I can not make anything else of it."

When asked if the extraction of teeth is a possible source of infection of streptococcic germs, he said:

"It is possible, but from this history that is out. I do not think the teeth had anything to do with it."

Dr. Heman Humphrey and Dr. Oscar Bloch expressed the opinion that the blood stream infection resulted from the injury and not from the extraction of the teeth. Dr. Samuel A. Overstreet, who was introduced by the company, stated that it was impossible to determine whether the hematoma or the extraction of the teeth caused the infection. Five physicians, who testified for the company, expressed the positive opinion that the infection resulted from the extraction of the teeth. Thus there was conflict in the medical testimony.

The circuit judge eliminated the opinion evidence of the physicians on the theory that opinion evidence of experts or specialists is without probative value. While it has been said by this and other courts that the opinion of experts is the weakest evidence known to the law, yet, in cases of this kind, it has always been held that expert medical testimony is competent. Its weight and the credibility of the witnesses are matters for the fact finding tribunal, in this case the Workmen's Compensation Board. Benito Mining Company v. Girdner, 271 Ky. 87, 111 S. W. (2d) 571; Black Mountain Corporation v. Lucas, 271 Ky. 655, 113 S. W. (2d) 15, decided January 25, 1938; Hardy-Burlingham Mining Company v. Hurt, 253 Ky. 534, 69 S. W. (2d) 1030; Black Star Coal Company v. Powers, 252 Ky. 736, 68 S. W. (2d) 30; Fordson Coal Company v. Bledsoe, 236 Ky. 409, 33 S. W. (2d) 302. See, also, Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. (2d) 311, 69 A. L. R. 1135.

That the testimony of experts is frequently colored, probably unconsciously, by bias and partisanship, is recognized by the courts, and it is for that reason that they accord to it less weight than is given to other types of evidence. Efforts to eliminate the evils of bias and partisanship, which sometimes shape expert testimony, have not been wholly successful. A remedy was suggested in Re Estate of Dolbeer, 149 Cal. 277, 86 P. 695, 702, 9 Ann. Cas. 795, where the court said:

"This kind of expert testimony, given under such circumstances, even the testimony of able and dis-

interested witnesses, as no doubt these were, is in the eye of the law of steadily decreasing value. The remedy can only come when the state shall provide that the courts, and not the litigants, shall call a disinterested body or board of experts, who shall review the whole situation, and then give their opinion, with their reasons therefor, to the court and jury, regardless of the consequences to either litigant. So, and so only, can it be hoped to remove the estimate of infirmity which attaches at the present time to this kind of evidence.''

In Jessner v. State, 202 Wis. 184, 231 N. W. 634, 636, 71 A. L. R. 1005, in holding valid a statute providing for the appointment of experts by the court whenever, in any criminal case, expert opinion evidence becomes necessary or desirable, the court said:

"Its enactment was in response to a well-settled conviction that, in criminal cases at least, where the interests of society were involved, there should be some technical evidence from unprejudiced and reliable sources. This conviction grew out of the belief that under the then existing procedure there was a striking tendency on the part of experts to accommodate their opinions to the necessities of that side of the case upon which they were testifying, and that such opinions were to a very large extent prejudicial and unreliable. To secure the reliable and unprejudiced opinions of the · ablest experts in such cases, to the end that the purest degree of justice might be promoted, the board of circuit judges sponsored the enactment of this statute. If this statute must be condemned as unconstitutional, it will require retracement of most significant forward steps in judicial procedure, and bring regret to all who believe in steady progress towards the attainment of a more perfect justice.''

Medicine has not been reduced to an exact science, and, so long as medical experts honestly differ, fact-finding bodies will have to wrestle with disputed questions the best they may. Testimony of a physician, so far as it is expert testimony, may be based upon personal examination or it may be based upon

hypothetical questions which contain in detail the history of the case. Horn's Adm'r v. Prudential Insurance Company of America, 252 Ky. 137, 65 S. W. (2d) 1017; Illinois Central Railroad Company v. Townsend, 206 Ky. 329, 267 S. W. 161; Chesapeake & Ohio Railway Company v. Wiley, 134 Ky. 461, 121 S. W. 402; Jones on Evidence, secs. 1325 and 1346.

In the present case, there was evidence that the decedent was in good health before the accident, and that he suffered continuously thereafter; that before his teeth were extracted he had chills and sweats, symptoms of a blood stream infection. The hematoma extended deep into the tissues, and the blood vessels were crushed. According to some of the medical testimony, this furnished a fertile field for the incubation of streptococcic germs and openings in the blood vessels for their entrance into the blood stream. There was some relevant, competent evidence of probative value to sustain the board's award, and the circuit court erred in setting it aside.

The judgment is reversed, with directions to affirm the award.