## City of Owensboro v. Day et al.

Dec. 6, 1940.

George S. Wilson, Judge.

Ridley M. Sandidge and E. B. Anderson for appellant.

Lewis I. Igleheart for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Thomas Day on July 14, 1937, was in the employ of the appellant, City of Owensboro, as a lineman in the maintenance and operation of its municipally owned electric light plant. He was then about 25 years of age, weighed about 165 or 170 pounds, and was apparently in robust health, which, according to the evidence, he enjoyed throughout his life with the exception of some few semi-occasional minor complaints that were quickly alleviated. His health and physical build were such as that his friends and acquaintances regarded him as an athlete, and he participated in such games as baseball, football, tennis and others, in which he appears to have delighted and was a more or less expert. He married the appellee and plaintiff below, Eugenia Day, some four or five years before the above date, she being several years younger than her husband. At the time of his death on February 8, 1938, his only child, the appellee and plaintiff below, Thomas Eugene Day, was eight months old.

On the first date referred to above he sustained an

electrical shock by the passage through his body of an electrical current containing 2,400 volts, which happened while he was at the top of a pole supporting transmission wires, which he was in some manner repairing, and in performing his work one of his hands touched a live uninsulated transmitting wire. He had his other hand on some metal bar composing a part of the apparatus at that end of the pole, and metal spikes for climbing poles were attached to each foot, and each of them stuck into the pole, which had been creosoted, thereby making it a much better conductor of electrical currents. The only external physical indications of the effect of the current were burnt or blistered spots on each hand. When the shock occurred he made an exclamation which his nearby co-laborers recognized as a wail or outcry produced by an electrical shock—the peculiarities of which they described. Two of them rushed to the pole and started to climb it. Their weight shook it and which resulted in loosening Day's hand from the live wire. He was then assisted down the pole and was apparently restored within a comparatively short time, but he did no more work throughout that day. That night he complained of pains in his abdomen and back, but started to work the next day, but could endure it for only about one hour, the pains in both his back and abdomen continuing, and they virtually continued from that time on until his death on the day indicated, nearly seven months thereafter.

Every witness in the case, both laymen and professional, testified that the symptoms we have related which developed almost immediately after the shock, not only never improved, but grew steadily worse until he died. At least two local physicians, presumably of high standing with nothing in the record indicating to the contrary—and whose testimony fully supports that presumption—testified positively from information obtained while treating Day as their patient that the primary cause of his death was the shock he received. Those physicians were Dr. R. L. Schroeder and Dr. F. Virgil Chambers. The deceased became a patient of Dr. Schroeder sometime after receiving the shock and was treated by that physician for a period of about one month, during which time he was under close inspection and observation of the physician during a part of which deceased was confined in a hospital under the directions

of his physician. During that time, or shortly thereafter, Dr. Dixon at the request of Dr. Schroeder made X-ray pictures in an effort to discover the location of the trouble and its nature. He made a number of views, but did not attempt to make one of the liver, or possibly immediately adjacent organs connected therewith, since he explained that in order to successfully do so certain treatments should be first administered to the patient and preparations made therefor, which were more or less dangerous because medical science had not completely developed them so as to eliminate possible danger and for which reason he did not attempt to produce views of the parts referred to, and those he did take revealed no cause for the patient's trouble, either to him or Dr. Schroeder.

In the meantime—and at the suggestion of Dr. Schroeder—Day applied to Dr. R. Glenn Spurling, of Louisville, Kentucky, who, as we gather from the record, makes a specialty of nervous complaints. He treated deceased ''off and on'' from October 28, 1937— a part of which time the patient was in a hospital in Louisville. But it appears that he was also unable to locate the trouble, although the patient was then and continuously had been since receiving his shock, suffering great pains in both his back and his front covering his bowels and stomach, and which were so severe at times as to cause tears to flow from the patient's eyes, and to cause him to crouch upon the floor, from which he could receive no relief except by the administrations of opiates or kindred treatment. Such conditions continued throughout the period intervening between the shock received by the deceased and his death. He soon began to lose weight, and before he died it was reduced to 85 pounds, practically one-half of what it was before being shocked.

Sometime during the intervening period between the shock and his death, deceased visited a brother at Kirksville, Missouri, where the latter was educating himself to become an osteopath. Under the advice of his brother, the deceased was treated while in a hospital at Macon, Missouri, and latterly went to a sanitarium at Kirksville, Missouri. In the meantime the abdomen— and perhaps the stomach—of deceased became much extended and it was concluded that the only relief possible that could be given him was what is called in the record

an "exploratory" operation. It was performed by a physician in the sanitarium or hospital at Kirksville, Missouri, some twelve days before the patient died. It revealed cancerous conditions on portions of the liver and gall bladder within or around which a number of nobules were found, one of which was as large as an ordinary hen egg. It was, therefore, rendered plain to the professional eye of the operating physician that the patient had no chance to live. The wound was sewed up and death ensued at the time stated. We may not have recited the events that happened in exact chronological order, but we have given the substance of them, and they undisputably prove that the deceased died from the effects of a cancerous development of the parts of his body affected as discovered by the operating physician.

In due time following his death, plaintiff, for herself and her infant child, made application to the Compensation Board for an award, since both employer and employee had accepted our Compensation Act and were working under it. The city, as employer, denied that the affliction which produced its employee's death resulted from the shock he received; whilst applicants for the award contended to the contrary. A referee, who first heard the case, sustained the prayer of the application and rendered an award for the claimants. The employer applied for and obtained a hearing before the full Board and it considered the case on the same evidence adduced before the referee, and it coincided with him and confirmed his award. Thereupon the city, as employer, applied in due time to the Daviess circuit court for a review of the award that had been rendered, and upon trial it affirmed the Board and the referee, and from that judgment this appeal is prosecuted.

From our recitation of the history of the case it is plainly seen that the question for determination is the single factual one as to whether or not the affliction with which the deceased employee was suffering, and from the effects of which he died, is attributable to the shock he received, which latter was an "accident arising out of and in the course of his employment," and which latter fact is a requirement of our present Kentucky Statutes, Section 4880. The referee of the Board, the full Board, and the Daviess circuit court have each answered that query in the affirmative—the circuit court possibly being influenced (at least to some extent) by the provi-

sions of Section 4935 of our same statutes—and a part of the Compensation Act prescribing that the findings of fact by the Board shall be ''conclusive and binding'' upon any later reviewing court, which tries the case solely on the testimony adduced before the Board. However, we have interpreted and applied that provision of the statute so as to require the evidence heard by the Board to possess some probative force, and convincing weight sufficient to support a conclusion of its truth. Whensoever the evidence heard by the Board is of the nature and character indicated its finding of fact will not be disturbed by a reviewing court because, forsooth, it might appear to be contrary to the weight of the evidence, and which interpretation is expressly required by the section of the statute referred to. A large number of cases where the indicated practice has been followed are listed in Key Number System 417(7), beginning on page 669 of Volume 13 of West's Kentucky Digest, Master and Servant, and there are none to the contrary. However, in proper cases, notwithstanding the followed and applied rule to which we have referred, we have held that if the award of the Board was based on mere surmises and remote possibilities supported only by speculative evidence, it would not be sustained by the court—notwithstanding the provisions of the statute—and it is most vigorously insisted by able counsel for the city that this record presents such a situation authorizing the court to review and reverse the Board in its finding concerning the decisive fact. Our sole inquiry is to determine whether or not that contention of counsel is or not true—the dependents of deceased, who are the applicants here, contending to the contrary.

It will be perceived at once that the involved fact, like all others, must be determined when contested by the proof adduced. There are various kinds of proof the most usual and prominent of which is that given by the testimony of witnesses introduced and heard before the trial tribunal. The testimony of such witnesses must relate to facts in issue and about which they possess relevant knowledge. Therefore, when the disputed fact is one relating to a particular science, concerning which only an expert may possess knowledge, then the witness necessarily becomes an expert in that science, since laymen are not supposed to—and in a great major-

ity of the cases do not—possess knowledge concerning the involved obscure and scientific fact. Therefore, in a case like this one the only competent witnesses to prove the concrete and decisive fact involved must necessarily be members of the medical profession. Laymen can, and they did in this case, testify concerning many relevant facts which we have hereinbefore rehearsed concerning the conduct, effects, external symptoms, reduction in weight, and other occurrences and conditions having a more or less bearing upon the case; but, after all, the expert witness must be consulted in order to arrive at a correct conclusion.

At least two physicians, testifying from information they received in actual treatment of the deceased servant, and from eventual developments, gave it as their unqualified opinion that the cancerous condition found by the exploring operation referred to resulted from the accidental shock sustained by the deceased. One of them, Dr. Schroeder, stated in answer to a question propounded to him that: "It is my firm conviction that the condition from which Tommy Day suffered throughout the period of his illness and from which he died, was the direct result of that shock of electricity." He later explained his reasons for that conclusion by saying that: "The effect of a shock of electricity would be a sudden depression with a forcing of practically all of the fluids in the circulatory system into the portions with the least resistence, the brain, liver, lungs and other organs, which in turn would cause a vasomotor paralysis and oedema of the viscera." He explained his reasons therefor and further along in his testimony he was asked to explain how a shock of the character here involved would affect such internal organs, to which he answered: "By producing hemorrhages, such hemorrhages may be and usually are permanent in their destructive results. Such permanent lesions the result of those vascular changes would interfere with the functions of the organs which are involved, the brain, spine, liver, vasomotor system one and all." The other physician testifying for claimants coincided, in substance, with Dr. Schroeder in his testimony, who furthermore testified that such a shock as decedent received would expand the blood arteries of the organs referred to so as to cause the hemorrhages of which he spoke. If so, then necessarily there would be a wound though diminutive,

yet fulfilling the requirement of a traumatic injury if it be necessary that such should appear in order to receive benefits under our statutes.

Perhaps four professional witnesses testified for the city, at least three of whom disagreed with the expert testimony introduced by applicants and gave it as their professional opinion that the conditions found by the operating physician were not produced as a proximate result of the shock. Such witnesses, one of whom was Dr. Spurling, treated and saw the deceased before he was operated on, and from that knowledge, and other historic facts of the case, they based their conclusions, although they each said that they were unable to account for the patient's condition, except upon the theory that he was an unfortunate victim of the cancerous condition, but what produced it or caused it to develop they did not know, except that the shock did not do so.

Attention, however, is called to the statement of one of the city's professional witnesses who saw the deceased some month or six weeks after the shock and who stated that on that occasion the deceased told him that he had been suffering in the manner he was then undergoing for some two months or more, which, if it had been literally true as to the time when the pains began, would have carried it beyond the date of the shock. Much reliance is made on that testimony. But no one can read this record in the light of the testimony of all of decedent's associates—some of whom were constantly with him—without becoming convinced that the pains he suffered, and the conditions produced, followed the shock he received and that none of them preceded it. We are, therefore, forced to the conclusion that either the physician who so testified misunderstood the statement attributed to the deceased, or the latter did not attempt to measure accurately the time from which his pains began. At any rate, we do not think that the item of testimony so relied on is sufficient to reduce all of the other proof heard in behalf of claimants to the point where a court would be authorized to reject it as possessing no probative force, or not enough, within the rule prescribed by the statute, to sustain the Board's finding.

We are aware of the view most generally advanced that expert testimony should be cautiously received. But it is the only kind we have or could obtain in arriv-

ing at a correct conclusion in this case on the crucial and decisive question, as we have hereinbefore pointed out. We have no more right to conclude that the expert witnesses who testified for the claimants should be disbelieved any more than the same class of witnesses who testified for the city. If such testimony should be discarded, then all of the expert testimony bearing on the decisive issue in the case would be eliminated and there would remain only the conditions and circumstances proven by the lay witnesses.

An almost exact situation was before this court in the case of Agsten v. Brown-Williamson Tobacco Corporation, 272 Ky. 20, 113 S. W. (2d) 829, 830. It was correctly stated in our opinion in that case that: "The dispute narrows to the single question: Was there any competent, relevant evidence having probative value tending to support the board's finding of fact that the blood stream infection which caused Agsten's death resulted naturally and directly from the traumatic injury?" The court then quoted from the case of Diaz v. United States Coal & Coke Co., 270 Ky. 565, 110 S. W. (2d) 290, 292, in which latter case we said: "In determining a question of fact the Workmen's Compensation Board is not limited to direct evidence, but like other tribunals may consider all the circumstances." The facts as disclosed by that record concerning the physical condition of the deceased employee were then related, and which were, that he was in the same state of good health that this record show he possessed antedating his injury. He (deceased therein) then began to decline, but not so abruptly or so rapidly as did the deceased in this case. The Board rewarded claimant in that (Agsten) case, but which the court on review reversed upon the ground that it concluded the finding of the Board was not sustained by proper testimony as measured by the rule supra. We reversed that judgment with directions to affirm the award of the Board. We referred in our opinion therein to the disposition of courts to regard expert testimony with suspicion, but when it is the only kind to which resort may be had the case should be determined in accordance with provided rules governing the investigation of all other facts, and in summing up the entire situation, we said:

"Medicine has not been reduced to an exact science, and, so long as medical experts honestly differ, fact-

finding bodies will have to wrestle with disputed questions the best they may. Testimony of a physician, so far as it is expert testimony, may be based upon personal examination or it may be based upon hypothetical questions which contain in detail the history of the case. Horn's Adm'r v. Prudential Insurance Company of America, 252 Ky. 137, 65 S. W. (2d) 1017; Illinois Central Railroad Company v. Townsend, 206 Ky. 329, 267 S. W. 161; Chesapeake & Ohio Railway Company v. Wiley, 134 Ky. 461, 121 S. W. 402; Jones on Evidence, Sections 1325 and 1346.

"In the present case, there was evidence that the decedent was in good health before the accident, and that he suffered continuously thereafter; that before his teeth were extracted he had chills and sweats, symptoms of a blood stream infection. The hematoma extended deep into the tissues, and the blood vessels were crushed. According to some of the medical testimony, this furnished a fertile field for the incubation of streptococcic germs and openings in the blood vessels for their entrance into the blood stream. There was some relevant, competent evidence of probative value to sustain the board's award, and the circuit court erred in setting it aside."

There was some conflict in the testimony in this case as to what course an electrical current would take when passing through the human body as a conductor. A witness for the city said that it would go longitudinally through the body, and not affect other parts of the anatomy; but a practical expert who had worked about and with electrical currents, and who was superintendent of the city's water plant, testified that he had witnessed a number of shocks and himself had experienced them. He testified that "The current would go through his entire body." In addition to his practical experience, that witness had taken a correspondence course in the science of electricity, and its uses, though he held no diploma from any institution teaching such learning. He gave it as his opinion that the heavy shock received by the deceased in this case went through his entire body and affected all of its organs alike.

In the light of the testimony appearing in the case, and the applicable law as declared by the courts, including this one, we are constrained to the conclusion that

we are without authority to reverse the judgment appealed from, although, as laymen, we might experience difficulty in concluding that the cancerous condition resulting in the death of Thomas Day was produced by the electrical shock he received. But electricity, and the delicate and intricate construction of the human body, are each mysteries to the members of this Court, and we must receive our information concerning them from those who have been educated along such lines, and have become experts with reference thereto.

There appears, therefore, no alternative except to affirm the judgment, which is accordingly done.