## Chicago, St. Louis & New Orleans Railroad Company, et al. v. Rowell.

(Decided December 20, 1912.)

### Appeal from Grayson Circuit Court.

1. Carriers—Injury to Passenger—Action for Damages—Failure of Proof—Peremptory Instruction.—Where in an action for damages by a passenger against certain carriers for personal injuries alleged to have been caused by "the carelessness of the defendants and each of them in the construction, maintenance and operation of the tracks, roadbeds, switches and turnouts and the operation of said trains and defects in said locomotives and cars," the petition also alleges that by the joint and concurrent negligence and culpable carelessness of defendants, and each of them, the coach in which plaintiff was riding was wrecked, derailed and thrown off the track, and the proof shows that the train was wrecked and plaintiff was injured, defendants are not entitled to a peremptory instruction on the ground that the proof failed to show that the coach in which plaintiff was riding was derailed, the derailment of the coach not being the ground of the negligence, but merely the result thereof.

2. Carriers—Injury to Passenger—Lessor and Lessee—Joint Use of Tracks.—Where a passenger is injured by the negligence of the switchman of a railroad using the tracks jointly with another railroad, which operates and uses the tracks under a lease from a third railroad, all three companies are liable for the injuries thus received.

3. Carriers—Injury to Passenger—Action for Damages—Evidence.— Where a passenger is injured, but fails to notify any of the employes of the train of such injury, it is improper to permit her to testify that none of the employes on the train assisted her in getting off the train.

4. Evidence—Physician.—Where a physician examines plaintiff for the purpose of qualifying himself as a witness, it is error to permit him to detail the history of the case as given him by the plaintiff.

5. Evidence—Opinions—Non-Experts.—It is improper to permit one not an expert to pronounce the plaintiff "a well woman" prior to her injuries. Such a witness may describe the appearance of plaintiff before and after the accident, and tell any facts she may know in connection with plaintiff's ability or lack of ability to

move about and perform her usual household duties, thus leaving the jury to determine her condition from the facts so testified to.

6. Carriers—Injury to Passenger—Action for Damages—Evidence.— Where, in an action by a passenger against a carrier for personal injuries, plaintiff claims that she was thrown against the seat or side of the car and injured, and that her injury was due to the stopping or the jar of the car, it is improper to refuse to permit a witness to testify as to whether or not there was such jolt or jar as would throw a person about in the seat, and refuse to permit another witness to testify as to whether the stop of the train jerked him or anybody there in his view.

7. Carriers—Injury to Passenger—Action for Damages—Verdict— Damages—Excessive.—In an action for damages by a passenger against a carrier for personal injuries, evidence examined, and held that a verdict for $7,500 was excessive.

8. Carriers—Injury to Passenger—Action for Damages—Instruction. —In an action for damages by a passenger against three carriers, an instruction that tells the jury that the switchman of one of them was the employe of all three defendants, if they believe from the evidence that he was the employe of one of them, does not assume that such employe was the agent of the three railroad companies, and is not, therefore, erroneous.

9. Carriers—Injury to Passenger—Action for Damages—Instruction —Punitive Damages.—Where a passenger is injured by the negligence of a switchman of a railroad company in turning the switch under a moving train on which he was riding, the conduct of such employe shows such wanton and reckless disregard of human life as to authorize an instruction on punitive damages.

LOUIS A. FAUREST, M. A. ARNOLD, C. L. SILVEY, TRABUE, DOOLAN & COX, B. D. WARFIELD and CHAS. H. MOORMAN for appellants.

JOHN C. GRAHAM, JOHN CAMPBELL and CHAPEZE & CRAWFORD for appellee.

OPINION OF THE COURT BY WILIAM ROGERS CLAY, COMMISSIONER—Reversing.

Plaintiff, Loula Rowell, brought this action against the Chicago, St. Louis & New Orleans Railroad Company, the Illinois Central Railroad Company and the Louisville & Nashville Railroad Company to recover damages for personal injuries alleged to have been caused by the joint and concurrent negligence of defendants. The jury returned a verdict in favor of plaintiff for $7,500. Judgment was entered accordingly, and the railroad companies appeal.

On the afternoon of December 23, 1910, plaintiff, after purchasing a ticket from Leitchfield to Louisville,

boarded one of the Illinois Central Railroad trains at Leitchfield. She was accompanied by her young son. She first got into the coach next to the rear coach which was a chair car. Later on she took a seat in the chair car near the front on the right-hand side. When it reached a point near 4th and Magnolia streets in Louisville, the train, which, according to her evidence, was running rapidly, suddenly lunged forward and then backward. She was sitting in a chair putting on her cloak, and had her arms up. The jerk of the train caused her right side, near the waist-line, and her arm to strike the chair or the window, she did not know which. The blow made her sick and dizzy, and gave her a pain in her head, back and side. She remained in the coach until everyone had left except an old man. Upon leaving the coach, she walked to 12th street, where she took a car for her sister's home at 18th and Dumesnil streets. She reached her sister's home about 8:20. She drank a little coffee, sat up for about twenty minutes, and then retired for the night. She slept badly during the night, and next morning suffered from a hemorrhage of the bowels. After that she had continuous hemorrhages from the bowels up until about a month before the trial. On Saturday, the day after the alleged accident, she was still weak and nervous, and suffered pain from her back and side. She had four or five hemorrhages that day. On Sunday her condition was about the same. She had several hemorrhages that day. On Sunday afternoon she and her sister walked up to see Mrs. Talkington, who lived a few squares away. On Monday they spent the day with Mrs. Talkington. While there, she had a hemorrhage from the bowels. On Tuesday she returned to her home at Leitchfield because she was not feeling well. She did not call a physician until December 30th, when Dr. Clark was sent for. She went back to Louisville on January 23, 1911, to be treated by Dr. Woody, and remained there until February 12th. In May she again returned to Louisville, and went from there to Frankfort to see her mother. In November, 1910, she weighed 160 pounds, had a good appetite and good health. She was able to perform all her houshold duties, work in her yard and garden, and ride horseback. Since the accident, she had suffered severe pain, and was unable to work. At the time of the trial, she weighed about 128 pounds. Plaintiff admitted that she suffered greatly

from suppressed menstruation, but claimed that she never stayed in bed over two or three hours at a time. She admitted that the physicians had to give her something to relieve her condition.

Charlie Taylor, who formerly had been a freight brakeman in the employ of the Illinois Central Railroad Company, testified that on the day of the alleged accident he was on the east side of the I. C. railroad track at 14th street, up near what is called Magnolia street, when the train came into Louisville, and only a short distance from the place of derailment. A switchman, or L. & N. man of some kind, ran up to the switch, and was fooling with it. The switch was thrown between the baggage car and the first day coach. One car went on the main track and one went down the siding where the L. & N. crew was. There was a smash-up, like a mess. The passenger train stopped on the other side of the crossing about twenty or thirty feet. The train was running about fifteen or eighteen miles an hour. The first day coach went down the siding, and knocked some bars off of an L. & N. engine, and damaged the engine some—side-swiped it. It was a severe crash. The air hose came apart. The stop was sudden and unusual. On cross-examination, he stated that from the Southern crossing to the switch that was thrown, the distance was about forty feet. He did not examine the hose to see if it had been broken, but thinks it must have been. The switch was an L. & N. switch, and the track was an L. & N. track, on which the switch engine was standing. Did not know who the man that threw the switch was. He was there with the L. & N. crew. The first coach and the baggage car left the track, but the two rear coaches never left the track.

Jacob Ricketts stated that he was a car inspector of the L. & N. R. R. Co. He inspected the cars on 14th street near the Southern crossing about one hour after the accident. The front trucks of the baggage car were on the main track, and the rear trucks were on the siding. An equalizer bar on the baggage car was broken, and ten siding boards on the baggage car were raked. The air hose was not broken. He examined the hose. The two rear coaches never left the rails. The rear coach was still on the main track. The inside rail under the combination car had turned over, leaving it sitting on the ground.

Dr. A. D. Willmoth, a Louisville physician who had been practicing for sixteen years, and who made a specialty of surgery and diseases of women, testified that he examined plaintiff on about April 1, 1911. She was suffering from a hemorrhage from her womb, which was turned back slightly. The tubes and ovaries on either side were congested. The womb itself was movable, with the exception of a slight fixation, and the appendages were slightly congested. She was very tender over the right kidney, and was nervous and very weak. The womb was larger than it ought to be, and must have been painful while plaintiff was standing on her feet, as it had a tendency to produce a lagging sensation. The condition of the kidney was probably due to contusion. Plaintiff's pulse would go up when he touched there, and it gave her pain, showing that she really suffered pain in that region. In his opinion, her condition was permanent unless she was operated on. On cross-examination, he stated that hemorrhages from the bowels might be caused by many things, such as severe dysentary or irritation. Any blow sufficiently hard to produce a hemorrhage of the bowels would most probably produce a rupture. Such an injury is either fatal very quickly, or the patient recovers in a short time. When he saw the plaintiff there was no evidence of injury of this kind. He found evidence of injury to the uterus only. It was doubtful if the blow received on the back in December would produce a tenderness in the kidney in the April following, without displacing the kidney. Never knew of a case where a person sitting in a chair received an injury that resulted in displacement of the womb. This was usually caused by falling on the buttocks or feet. Didn't think the stopping of a passenger train twice as hard as usual would have produced the condition in which he found plaintiff.

Plaintiff's sister, Mrs. Houtchens, testified that plaintiff reached her house about eight o'clock. Plaintiff seemed awful tired, worn out and nervous. Didn't eat much supper. Remained up about twenty minutes after arriving. She had a hemorrhage of the bowels Saturday morning. Went to Mrs. Talkington's on Sunday. Could then walk naturally. From her facial expression, she seemed to suffer pain. When she woke up, she appeared restless and nervous. Plaintiff returned to her home in January, and remained about three weeks. She was then poorly, lying down most of

the time, nervous and having hemorrhages of the bowels. Plaintiff had lost flesh and was not able to get around much. When she returned in May, her condition was about the same as in January.

Dr. F. L. Wilhoit testified that he examined plaintiff and found her suffering from traumatic neurasthenia. She had a number of symptoms of that condition, such as irritability, headache, backache, inability to concentrate her thoughts and to read, straining of the eyes, and vasomoter disturbances. Her heart beating was very rapid; in the neighborhood of 98, when 72 was normal. Her respiration was fast and shallow. She had a tenderness over her right kidney and spine, and a good deal of congestion of the uterus, ovaries and tubes, entailing a good deal of trouble at the menstrual periods, and lasting longer than it should last. She had lost some weight since he examined her in April. When examination was made she suffered pain, and was easily excited. She got out of breath from the least exertion. Was not able to take walks for any distance. Pain would necessarily accompany conditions which were found. Her condition on her last examination was worse than when he examined her nine months prior thereto. In his opinion, her condition was permanent. He testified also that plaintiff gave him a history of some hemorrhages at the time following the accident, and of the fact that she had suffered pain at various times, and had lost weight. On cross-examination, he testified that he examined plaintiff for the purpose of qualifying himself as a witness. Anything that would deplete the system would render person subject to neurasthenia. He made no examination of the bowels, and found no evidence of hemorrhage of the bowels.

Five or six of plaintiff's neighbors testified that she was stouter before the injury, and was able to do all of her work then, but since the injury had not been able to do so. Two or three of them admitted on cross-examination that plaintiff, prior to the alleged injury, had an occasional sick spell which would confine her to the house, but not over a day at a time.

Dr. F. C. Woody testified that he examined plaintiff on January 25, 1911, in Louisville. He found her a tall, well developed, healthy-looking young woman, apparently weighing in the neighborhood of 150 pounds. She looked worn and anxious, and was nervous. Her hands and arms trembled, which condition she said had

come on her since the railroad accident. Her bladder was disturbed, and she was unable to hold her urine. She had cramps of the bowels between actions, and hemorrhages of the bowels at every action. Her appetite was bad, her tongue coated, and her digestion impaired. Looked worn from loss of sleep because she had had a headache that kept her awake. There was tenderness down the sides of the neck, and especially in the back of the head. Her heart was normal, and there was nothing the matter with her left lung. Her respiration was a little shallow and catchy, which he found due to a tenderness in her right lung. Her right side was quite tender from the collar bone down. Her liver and abdomen were also tender, and the tenderness extended around to the back. On listening, he found a dullness and a sound of congestion in her lungs, showing that she had some pneumonia. Her ribs were very tender to the touch. Could not determine whether there was a fracture or not. She complained of great pain all up and down her spine, and pain in the lower part of the abdomen. She was menstruating at the time so you could not examine her to see what injury was there. During the early part of May, he, Dr. Koontz and Dr. McMurtry made an examination. Found the womb turned backward, showing some injury or infection. She was still having pain in her bowels and occasional hemorrhages, which he thought might be due to the position of the womb. What caused it, he did not know. Had thought that she would improve, but was disappointed at finding her looking so thin and worn. Her spine was very tender to the touch, and her condition never improved. Thought that her health would be permanently impaired. On cross-examination, stated that the congested condition of the lungs had disappeared. Dr. W. S. Clark stated that he had known plaintiff for three or four years, had been her family physician. Prior to her alleged injuries, she was a stout, healthy woman. When he was first called to treat her on December 30, 1910, she was suffering with a pain in her back and in her side. Her temperature was 102. Found her sixth or seventh rib on the right side broken near the spine. She was very tender along the spine, and very nervous. Saw her various times thereafter. Examined her during the month of April, 1911. She was still tender along the spine near the broken rib, but had no fever. Made a vaginal examination, but was unable to discover any-

thing wrong there. She claimed to have had hemorrhages from the bowels, but he knew nothing as to this except what she said. When he first examined her, he thought she would recover, but she had not done so. She had lost a good deal of flesh, her appetite was bad, and she frequently had to take a narcotic before she could sleep. On cross-examination, he stated that there was nothing wrong with her womb or female organs when the examination was made in April. He visited her frequently before the alleged injury. She had painful menstruation. Frequently he had to give her something to relax her. As soon as the period was established, she would be up. This condition rarely ever lasted over 12 or 14 hours. When he first saw her, in December, 1910, she probably had a slight attack of pneumonia. He gave her medicine ordinarily given to relieve a severe cold, and the congestion of the lungs cleared up in eight or nine days. H. C. Houtchens, plaintiff's brother-in-law, testified that she came to his house about nine o'clock. She looked tired and worn out. She retired in about an hour. On Sunday she seemed worse, and got worse all the time she was there. Then she came back to his home in about six months. Didn't recall any visit in January, 1911.

The evidence for the defendants is as follows: Miss Sallie Heiner and Miss Ada May Meredith, who were seated just across the aisle from the plaintiff, testified that the train was going slowly at the time it stopped, and that there was no unusual jerk or jar of the train. Neither of these witnesses knew that the train was derailed until some one came into the train and informed them of this fact. They both say that the plaintiff was not thrown or jerked in any way.

Miss Bertha Morgan, a school teacher, T. E. Sanders, a concrete contractor, W. C. Hager, a journalist, Harry Jack, a journalist, and his wife, W. C. Lee, who travels for the Courier-Journal Company, C. M. Brame, who travels for the Bowling Green Nursery Company, and W. P. VanCleave, a farmer residing at Hodgensville, all testified that they were on the train in question, and that the train was moving slowly and stopped in the ordinary way, without any unusual jar or jerk.

Mrs. Talkington testified that plaintiff visited her on Sunday afternoon and Monday, following the derailment. Plaintiff told her of the derailment, but made

no complaint of having been injured in any way, or of being unwell. Plaintiff had no hemorrhages at her house.

Dr. Lewis S. McMurtry, a specialist in the diseases of women, and abdominal surgery, testified that he examined plaintiff under order of court on April 12, 1911. When he made the examination, Drs. Clark, Wood and Willmoth were present. He found nothing the matter with her lungs, spine, bowels or womb. There was no evidence of any injury to the bowels. He had never known, in a practice of 30 years, an instance of hemorrhage of the bowels from a blow on the surface of the body. Could not understand how a blow on the surface of the abdomen could produce a hemorrhage from the alimentary canal. If it were possible to give a blow causing such injury, it would be in the abdomen, and the plaintiff could not sit up or walk. Found plaintiff's uterus in its natural condition, and her ovaries and tubes normal and free from diseases and adhesions. Found no trouble with the kidneys. Never heard of such a thing as falling of the womb being caused by a blow to the womb while sitting down. Plaintiff, however, was not well. Her nutrition was not good. Her general nervous tone was below par. This may be due to a variety of causes, and is not an organic disease. Great pains during the menstrual period are often associated with neurasthenia. The duration of pneumonia from traumatism is from 12 to 14 days.

Dr. L. Koontz testified that he was a surgeon, and examined plaintiff in connection with Dr. McMurtry on April 12, 1911. The examination was thorough. Found no evidence of any injury to the spine. Never knew of a hemorrhage of the bowels being caused by a blow on the outside of the body. We do find hemorrhages of the bowels from other causes. Plaintiff's uterus and tubes were in normal condition. There was no trouble with the lungs, spine or kidneys. The reflexes were normal. Plaintiff had neurasthenia, and this was not caused by any organic trouble. The painful conditions during menstruation are evidence of neurasthenia.

The defendants were not entitled to a peremptory instruction because the petition charged that the coach in which plaintiff was riding was derailed, while the proof showed that, as a matter of fact, it was not derailed, but remained on the track. The negligence specified in the petition is "the carelessness of the

defendants and each of them in the construction, maintenance and operation of the tracks, roadbeds, switches and turnouts, and the operation of said trains, and defects in said locomotives and cars,'' by which plaintiff's said injuries were produced and inflicted. It is true that the petition does allege that by the joint and concurrent negligence and culpable carelessness of defendants, and each of them, the coach in which plaintiff was riding was wrecked, derailed and thrown off the track, thereby seriously, permanently and painfully injuring the plaintiff, etc. The derailment of the coach is not the ground of negligence relied on, but merely the result. The fact that the plaintiff alleged too much will not defeat a recovery. There was evidence tending to show that the switch was turned under the train while in motion by an L. & N. switchman, and that the train itself was wrecked. If the train was wrecked by the negligence of the defendants, and plaintiff was thereby injured, she is entitled to recover, even though the coach in which she was riding was not derailed.

The railroads did not introduce any evidence to the effect that it was not an L. & N. switchman that threw the switch, or that the accident did not happen upon the L. & N. track. In the absence of such evidence, we think the testimony of Charlie Taylor was sufficient to take the case to the jury on that question. If it be true that the accident happened on an Illinois Central train, and that the switch was turned by an L. & N. switchman, and the tracks were leased by the Chicago, St. Louis & New Orleans Railroad Co. to the Illinois Central Railroad Co., and jointly used by the Illinois Central Railroad Company and the Louisville & Nashville Raiload Company, a fact which seems to be admitted by the pleadings, then we conclude that for the negligence of the switchman, all three of the railroad companies are liable. McCabe's Admx. v. Maysville & B. S. R. Co., 112 Ky., 861, 23 R., 2328, 66 S. W., 1054; I. C. R. Co. v. Shegog's Admr., 126 Ky., 254, 103 S. W., 323, 31 R., 691; L. H. & St. L. R. Co. v. Kessee, 31 R., 617, 103 S. W., 261.

The court improperly permitted the plaintiff to testify that no one of the employes on the train on which she was riding assisted her off the train. She states that she did not inform anyone that she was injured. Unless they knew that she was injured, there was no necessity for offering her any assistance.

The court erred in permitting Dr. Wilhoit to detail in part the history of her case as given by plaintiff. Where a physician examines a witness for the purpose of treatment, he may testify to what the patient said. Where, however, he examines a patient for the purpose of qualifying himself as a witness, he will not be permitted to do so. Dr. Wilhoit admits that he examined plaintiff for the purpose of testifying. That being true, what the plaintiff said to him was not admissible as evidence. C. & O. R. Co. v. Wiley, 134 Ky., 461.

It was likewise improper to permit Mrs. Harrison Roberts, over defendants' objection, to pronounce the plaintiff "a well woman prior to the alleged injuries." She was not an expert, and should not have been permitted to give an opinion on such matters. She had a right to describe the appearance of plaintiff, before and after the accident, and to tell any facts she knew in connection with the plaintiff's ability or lack of ability to move about and perform her usual household duties, thus leaving to the jury to determine the conditions from the facts so testified to. Illinois Life Insurance Co. v. DeLang, 124 Ky., 569.

When counsel for defendants asked Miss Bertha Morgan if there was any such jolt or jar as would throw a person about in the seat, the court should have permitted the witness to answer. The same ruling should have been made when the witness, T. E. Sanders was asked: "Did that stop of the train jerk you or anybody there in your view, Mr. Sanders?"

The weight of the evidence is to the effect that no unusual jar or jerk attended the stopping of the train on which plaintiff was riding, and that plaintiff was not jerked or thrown at the time the train stopped. Conceding, however, that she was, the evidence is by no means satisfactory that the injuries which she claims to have suffered were caused by any jar or jerk which she received on the occasion in question. Prior to the time of the alleged injury, plaintiff suffered greatly from suppressed menstruation; so much so that her own witness and physician testified that it was frequently necessary to give her medicine to relieve this condition. This of itself was sufficient to account for the congested condition of the uterus, and it is altogether improbable that this condition was in anywise contributed to by any shock that she received on the train. Nor is there any definite testimony tending to show that the hemorrhages

of the bowels from which she claims to have suffered were probably produced by a blow. Old and prominent physicians testified that in a number of years of practice, they never knew of such a thing. To have caused this condition, the blow must have been a very severe one, and it is hardly probable that the plaintiff, had she received such a blow, would have failed to call the attention of some one on the train to the fact, or would have failed to mention it to her friend, Mrs. Talkington, with whom she spent the day. If it be true that she suffered greatly from suppressed menstruation, as she herself admits, and as Dr. Hall testifies, and if it be true, as Dr. Woody says, that she was subject to great flooding when her periods came, it is much more probable that the neurasthenia from which she is suffering is due to this condition rather than to any blow that she received on the occasion of the wreck. The congested condition of her lungs has passed away. Her rib, if it was fractured, has grown together. Her kidney is not shown to have been permanently injured. We, therefore, conclude that a verdict of $7,500, under these circumstances, is excessive.

Instruction No. 1 is not subject to the criticism that it assumes that the switchman operating the switch was the agent of the three railroad companies. The court told the jury that he was the agent or employe of the three defendants only in the event that the jury believed from the evidence that he was the employe of the Louisville & Nashville Railroad Company.

On another trial the court, in submitting the questions set forth in instruction No. 2, will also submit the question whether or not plaintiff was thereby injured.

It was not error to give an instruction authorizing the recovery of punitive damages against the Louisville & Nashville Railroad Company. If, as a matter of fact, the person turning the switch was the employe of that company, and turned the switch under the moving train, his conduct showed such a wanton and reckless disregard for human life as to authorize the infliction of exemplary damages. Louisville & Nashville R. R. Co. v. Smith, 135 Ky., 462.

Our attention has been called to several instances where counsel for plaintiff went outside of the record in arguing the case to the jury. We have uniformly held that counsel, in making their arguments to the jury, should confine themselves to the law and the evidence,

and should not go outside of the record for the purpose of bringing to the attention of the jury matters which have no bearing whatever on the questions at issue, and which are conveyed to the jury for the sole purpose of inflaming their passions and exciting their prejudice. L. & N. R. R. Co. v. Crow, 32 R., 1145, 107 S. W., 808; Ky. Wagon Mfg. Co. v. Duganics, 113 S. W., 129; I. C. Ry. Co. v. Proctor, 122 Ky., 92; L. & N. R. Co. v. Payne, 138 Ky., 274, 127 S. W., 993. We deem it unnecessary to take up and consider the alleged instances of misconduct, but will content ourselves with calling the attention of counsel to the necessity of confining their arguments within the limits indicated.

Judgment reversed and cause remanded for new trial consistent with this opinion.