## Ellis v. Litteral et al.

Nov. 23, 1943.

Cary, Miller & Kirk and T. L. Rees for appellant.

R. M. Holland for appellees.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Affirming.

Virgil Litteral, who had been in the regular and continuous employment of appellant, James C. Ellis, received an injury on June 11, 1940, arising out of and in the course of his employment. Both employer and employee had accepted the provisions of the Kentucky Workmen's Compensation Act, KRS 342.001 et seq., and compensation at the rate of $15 per week, totaling $135, was paid to the date of Litteral's death, which occurred on August 13, 1940. While Litteral was engaged

in loading a heavy bit used in drilling oil wells, a gin pole affixed to a truck fell a distance of seven or eight feet, striking him on the back and possibly on the head. The pole weighed approximately 300 pounds. He was rendered unconscious, and was taken as speedily as possible to the Owensboro-Daviess County Hospital, where he was treated by his family physician, Dr. C. M. Rice, of Owensboro. Appellant employed Dr. R. W. Connor to take charge of the case. An X-ray examination was made of the back of the injured employee, which disclosed a fracture of the seventh and eighth thoracic vertebrae. Litteral remained in the hospital for thirteen days, when he was placed in a cast and permitted to return to his home at Whitesville, in Daviess County. The cast was removed in approximately five weeks after it was placed on the patient, and Dr. Connor consented that the patient might travel to Salyersville, Kentucky, on the following Saturday, five days after the removal of the cast. The journey was made on Greyhound buses, a stop-over at Lexington, Kentucky, being required. While waiting for the Salyersville bus at Lexington, Litteral became ill, and complained of his head and back hurting him. He did not go to bed Saturday night, and arrived in Salyersville about 1:30 P. M. on Sunday. The following week was spent visiting relatives and friends, a large part of which time it was shown that he spent lying down. On the following Saturday night he suffered severely with pains in his head and back, and was not disposed to sleep. He ate no breakfast Sunday morning, but accompanied his family to an all-day meeting of the United Baptist Church. He, however, did not stop at the Church, but rode to the top of a hill above his father's house and walked down the hill to visit his father, where he remained the greater portion of the day. He ate nothing, and lay in a swing until about the middle of the afternoon, when he started back to the Church, a distance of between one and a quarter and one and a half miles. Hobart Sailor joined him and carried a sack of apples weighing approximately five pounds to the top of the hill, where he turned it over to Litteral, who carried it the rest of the way to the Church. It was a warm day, but witnesses testified that it was not unusually hot for that time of year. When he reached the Church he sat down by the side of the road, and after a short talk with his wife, proceeded to the home of Mrs. Minta Caudille, a sister of his wife. His suffering con-

tinued and grew gradually worse. He complained of exhaustion, his legs ached, he vomited, had some increase in temperature, rapid pulse, and a lowering of the blood pressure. He became delirious about 7 o'clock that night. Dr. Byron Conley was called in attendance and administered a sedative, but the patient continued delirious throughout the night. The following morning Dr. Conley directed that he be taken to a hospital in Paintsville, where he arrived at about 9 o'clock A. M. He was under constant treatment of Dr. Paul B. Hall and Dr. W. E. Akin thereafter, but showed no improvement, and died on Tuesday morning, August 13. A total award in the sum of $4,800 with interest at the rate of six per cent. per annum on past-due instalments, to be credited with the sum of $135 theretofore paid, and allowing $150 for burial expenses, was made by the referee and affirmed by the Compensation Board and the Circuit Court.

The sole contention on this appeal is that death did not result from the accident, and that testimony to the contrary was not sufficient to sustain the Board's finding. The opinions of this court in A. C. Lawrence Leather Co. v. Barnhill, 249 Ky. 437, 61 S. W. (2d) 1; Hardy-Burlingham Mining Co. v. Hurt, 253 Ky. 534, 69 S. W. (2d) 1030; and City of Owensboro v. Day, 284 Ky. 644, 145 S. W. (2d) 856, are cited in support of the contention of appellant. In the last two cases cited above, the rule is laid down that: Whether a death is the proximate result of an injury can be established only by the testimony of experts skilled in the medical and surgical profession, they being the only witnesses qualified to testify or express an opinion as to cause of death. That rule would seem to be at variance with the opinion of this court in Consolidation Coal Co. v. Marcum's Adm'r, 289 Ky. 220, 158 S. W. (2d) 150, wherein it was held that, although the opinions of physicians will be given great weight by the courts, where circumstances (uncontradicted) are shown which, if true, would tend to cast some doubt as to the correctness of the opinion of the experts, the issue resolves itself into one of fact to be determined by the Board. Opinion or expert evidence is neither conclusive nor controlling as against evidence of facts. In support of the decision in that case the court cited Barrowman v. Prudential Insurance Co. of America, 266 Ky. 249, 98 S. W. (2d) 912. To the same effect is the opinion in Straight Creek Fuel Co. v. Hunt, 221 Ky. 265, 298 S. W. 686. It seems to us that where the uncontra-

dicted sequence of events casts doubt upon the correctness of the diagnosis of physicians, the evidence does resolve itself into an issue of fact to be determined by the Board. But whatever may be the correct view in that respect, we are of the opinion that the expert testimony in this case is contradictory, and that the uncontradicted evidence of the sequence of events lends greater weight to the expert testimony introduced by the appellee than it does to that introduced by appellant. It was shown, without contradiction, that the decedent sustained a broken back on June 11, 1940; that he was placed in a cast thirteen days thereafter; that the cast was removed five weeks from that date; he was permitted by the Company's physician to travel to Salyersville, although the doctor testified that he did not know he was going on a bus, and thought he was going in his own passenger car. That from the time of the injury continuously until the time of his death, he suffered from severe pain in the region of the break, and in his head, and that two weeks after the cast was removed he died under severe and excruciating pain in the region of the break. There was no evidence of an intervening cause, unless it can be said that the walk of a mile and a half, the most of which way he carried five pounds of apples, was sufficient to cause a sunstroke or heat stroke, which in the opinion of Dr. Connor, of Owensboro, was the cause of his death. The symptoms of sunstroke, which Dr. Connor believed was the cause of death, were contradicted by the doctors who attended Litteral the last three days of his life. Dr. Hall testified that ordinarily with a heat stroke the temperature of the patient is very high, but that the temperature of this patient was not excessively high. He testified that, while at the end of six or eight weeks physicians feel fairly good about a fractured vertebrae, in his opinion one would not completely heal in a shorter period of time than one or two years after the break. He said that there was a swelling in the region of the break, and that the noticeable protuberance was the only sign of infection, but that an infection was indicated from the presence of excessive quantities of white blood cells. He stated that he was unable to determine the cause of death. Dr. Akin testified to practically the same findings, and stated that a victim of heat stroke usually has "awfully high fever * * * their temperature is all out of reason." The evidence shows that at no time was the patient's temperature over 102,

and that occurred just before his death; and when he was brought to the hospital his temperature was only 100½. That in the case of a heat stroke the temperature is at its highest immediately following the stroke. Dr. Conley, who attended the patient on Sunday night and Monday morning before his death, testified: "I don't think overheat would have made him do the way he was doing;" but he expressed no opinion as to the cause of death. Dr. O. W. Rash, of Owensboro, testified in response to a hypothetical question that, in his opinion, death was caused by the injury, and he was very positive in his opinion that the symptoms manifested by Litteral on the day of his death and the day prior thereto were not typical of heat exhaustion or sunstroke, and that in his opinion the exertion indulged in by Litteral on Sunday prior to his death did not contribute to the cause of death. He stated that he attributed the death to an injury on the head.

Objection is made to this testimony, because the hypothetical question contained a supposition that a head injury was received, which was testified to by two witnesses, and the further supposition, which was stated in the hypothetical question, that it was not present previous to the accident complained of, which was not supported by the evidence. Since it was not shown by the evidence that the depression in the head was not absent previous to the accident, the Board erred in permitting Dr. Rash to testify to the question presupposing this fact. But we think it was not prejudicial in this case, since the Board made its finding exclusively eliminating the testimony of Dr. Rash and the testimony as to the presence of a head injury. The Board's finding in this respect is in the following words: "Without accepting the 'sink place' theory advanced by the plaintiff, and without basing our findings upon the opinion of Dr. Rash, we reached the conclusion on the ultimate facts already reached by the referee."

Dr. C. M. Rice, who was Litteral's family physician, stated that he first attended the patient after the accident, but that he retired from the case when appellant employed Dr. Connor to take over the treatment. That he examined the X-rays, and agreed with the other doctors concerning the fractured vertebrae, and that he helped place the patient in a cast. He stated that after the patient left the hospital, the latter called at his office two or three times, and that on each of those oc-

292

casions he complained of pain in his back. That he advised Litteral to go home and remain in bed, instead of coming to his office, and that this advice was given because the doctor was of the opinion that "he was out too early with a broken back." That he did not think the patient physically able to make the trip to Salyersville, and that the fracture at that time would not be sufficiently united to become solid enough to be up and about. In answer to a competent hypothetical question (and about which no question is made), he replied: "Now, the exercise, I don't see hardly how he could have exercised himself in the walk of that distance to be overcome by the heat of the sun unless he made an unusual trip or went very rapidly to his place of destination. Inasmuch as he had been complaining continuously all of the time with his back from the time that I saw him, and from what I heard about his death later on it occurs to me that his death would be from the injury."

He further testified that Litteral was an able-bodied man before the injury. He stated that he did not know that Litteral was going to make the trip, and therefore did not advise him in respect to it.

Where the burden of proof is on plaintiff to prove the probable cause of death, such burden does not cast upon him the necessity of disproving every other suggested cause. 71 C. J. Sec. 879, pp. 1069-1070. And where death follows soon after the injury of an able-bodied man, a presumption arises that the death was caused by the injury in the absence of other than conjectural testimony to the contrary. 71 C. J. Sec. 863, p. 1061. The evidence clearly shows the deceased to have been an unusually able-bodied man for thirteen years previous to his injury, and that the symptoms he complained of from the time of his injury up to the very moment of his death were continuous, and gradually grew worse. The only doctor who testified that in his opinion death was caused by heat stroke was the doctor who advised him that it was all right to make the trip to Salyersville, and one of the ever present symptoms of sunstroke was definitely established not to have been present following his walk from his father's house to the Church. That being true, and excluding, as did the Board, the answer of Dr. Rash to the hypothetical question and the evidence concerning the head injury, we are of the opinion that there was ample medical evidence to support the finding of the

Board, and that the uncontradicted evidence of the sequence of events following the injury up to the moment of death strongly corroborated the testimony of the doctors for appellee.

Wherefore, the judgment is affirmed.

Whole Court sitting.