## Blue Diamond Coal Co. v. Neace et al.

December 10, 1946.

Craft & Stanfill for appellant.

S. E. Duff for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE REES—Affirming.

Bradley Neace, an employee of the appellant, Blue Diamond Coal Company, died November 27, 1943, shortly after he became ill while working in appellant's mine. Neace was about 40 years of age, and had been employed continuously by appellant for more than 20 years. He had worked in various capacities in and about the mine, and at the time of his death was employed as a coal loader. For some time he operated a supply motor, but on or about November 15, 1943, at his own request, was assigned to loading coal by his foreman. On December 18, 1943, his widow, Gracie Neace, filed with the Workmen's Compensation Board an application for adjustment of claim on behalf of herself and three infant children. It was stated in the application that Bradley Neace came to his death in the employer's mine as the result of "breathing bad air." A referee of the Board found that Neace came to his death from accidently inhaling poisonous gases, known as bad air, while working for the Blue Diamond Coal Company, and awarded his widow and children compensation at the rate of $12 a week for 400 weeks. The referee's finding and award was approved and adopted by the full Board, and the company filed its petition for review in the Perry circuit court which affirmed the award of the Board. It is urged on this appeal that there is no competent evidence having probative value to sustain the Board's award, and that the claim should have been dismissed. It is asserted that there is no evidence tending to show that Neace died from breathing poisonous gases or bad air in appellant's mine, but, on the other hand, the evidence shows conclusively that his death resulted from other causes.

On the day of his death, Neace was loading coal in No. 4 left heading off of mine entry No. 26. It appears that the nearest workmen were his 18 year old son, Glennis Neace, and Gabriel Fugate, who were loading coal in a room off of mine entry 26, about 300 feet from the heading where Neace was working. About 2 p. m. Neace left his place of work, and walked down the entry to the room where his son and Fugate were loading coal. Soon after arriving there he walked out of the room where Glennis Neace and Fugate were working, and they heard him call for help. They went out and found him lying

down in the entry and unconscious. He was taken out of the mine and to the office, where he died shortly after the mine physician arrived. Oliver Little was a motorman employed in appellant's mine. It was his duty to deliver empty cars to the coal loaders and material needed by them, and to take out loaded cars. During the day in question, he made four or five trips to the heading where Neace was working, and delivered empty cars and took out five cars, four loaded with coal and one with rock. He testified that the face of the coal where Neace was working was about 100 feet from the break-through from the entry into the heading. A booster fan had been installed at the break-through. The purpose of the fan is to draw out stale air and fumes which collect after the coal is shot down, and then to pump in fresh air. He stated that the fan was not operating on the day Neace was taken ill and died, and that the air in the heading was damp. He later modified this statement by saying he meant there was no air in the heading. He also testified that John B. Houston, the foreman, and a workman installed the fan on the day before Neace died. Houston denied that the fan was installed on November 26, 1943, and he and R. E. Hughes, repairman and electrician, testified that it was installed several days before Neace's death. Members of Neace's family and several neighbors who had known him for many years testified that he had never been ill to their knowledge except for a few days six or seven years before his death, when he had the mumps; that he was apparently in good health, and had worked regularly for appellant. Dr. H. Kermit Knoch, the company physician, treated Neace when he was brought out of the mine, and diagnosed his illness as idiopathic epilepsy. He testified that Glennis Neace told him at that time that his father had a similar attack about five years previously. Gracie Neace made a similar statement to him about two weeks after her husband's death. James E. Jackson, night mine foreman, testified that on November 15, 1943, Bradley Neace requested to be taken off of the supply motor. The witness said: "He came to me and told me we was doing him an injustice keeping him on a motor; and that sometimes he didn't realize where he was He said he didn't think he was safe on a motor." The foregoing was the only evidence in contradiction of the evidence for the claimants to the effect

that Neace was an able-bodied man apparently in good health and had worked regularly up to the day of his death. Appellant introduced no evidence to show that Neace had not worked regularly. Glennis Neace and Gracie Neace were introduced in rebuttal, and both denied making the statements attributed to them by Dr. Knoch and stated positively that Bradley Neace had no such attack prior to the day of his death, and had not been ill during the last five years of his life.

The evidence for the claimants tended to show that on the day that Neace was taken ill the room or heading in which he was working was not properly ventilated, and that he was a strong able-bodied person who worked regularly for many years before his death. This evidence was contradicted in many respects by evidence introduced by the employer, but it was competent and of sufficient probative value to authorize the award of the Workmen's Compensation Board, which is the trier of the facts and must determine the credibility of witnesses and the weight to be given their testimony. As said in Ellis v. Litteral, 296 Ky. 287, 176 S. W. 2d 883, 885: "Where the burden of proof is on plaintiff to prove the probable cause of death, such burden does not cast upon him the necessity of disproving every other suggested cause. 71 C. J. Sec. 879, pp. 1069-1070. And where death follows soon after the injury of an able-bodied man, a presumption arises that the death was caused by the injury in the absence of other than conjectural testimony to the contrary. 71 C. J. Sec. 863, p. 1061."

Dr. Knoch testified that he first saw Bradley Neace on November 27, 1943, after he was carried from a mine car to the mine office. He described Neace's condition then as follows: "He was disoriented and stared wildly about the room and complained of various pains throughout his body. He was pale, pulse was 88 and was breathing rapidly. In a short while he did recognize a few faces and asked for a drink of water. He became nauseated and vomited. Following this vomiting he held a cup of water in his hands and swallowed two capsules of P. A. C. compound. Shortly in a few minutes, I don't recall the exact time, he became very irregular in his breathing, became pale and had an epileptic like seizure while sitting in this chair from which he did not recover."

On cross-examination he was asked these questions and made these answers:

"Q. Had you before this time had any experience with one suffering from what we termed bad air? A. I have had some experience with bad air. I can say yes to that.

"Q. What are the symptoms of bad air, Dr. Knoch? A. The symptoms of bad air, as you speak of bad air what do you mean?

"Q. Carbon monoxide poisoning, carbon dioxide poisoning and any poisoning that you find in mines with what is termed bad air. A. The symptoms of carbon monoxide or natural gas poisoning depend on the amount of poison or gas taken into the system. A small amount of this causes throbbing of the temples and other parts of the system. Of course, high concentration in the blood will bring about violent vomiting and a thready pulse. * * *"

He testified that if the concentration is sufficient death will result. Webster's New International Dictionary defines the medical term "thready pulse" as a scarcely perceptible rapid pulse, feeling like a small string, occurring in shock, comatose states, and shortly before death." It will be noted that the symptoms of poisoning from breathing noxious gases in mines as described by Dr. Knoch, correspond exactly to the symptoms he found when he examined the decedent.

In Consolidation Coal Co. v. Marcum's Adm'r, 289 Ky. 220, 158 S. W. 2d 150, 152, Harlan Marcum, a disabled employee, filed an application for compensation on the ground that his disability resulted from breathing impure air and gases in the course of his employment as a coal miner. The Workmen's Compensation Board found that he was totally and permanently disabled, and awarded him the maximum compensation. The employee died during the pendency of the proceeding. The evidence was conflicting as to whether impure air or gas was present in the room where Marcum worked, and this court, in affirming the judgment of the circuit court which upheld the award of the Board, said: "We cannot believe that counsel for appellant are serious in their contention that there is not sufficient evidence to support the finding of the board in respect to the presence of im-

pure air and gas in the room where Marcum worked on the day he claimed to have been injured. Both Marcum and Scarbro testified directly to that effect, and, no matter how much testimony there may be to the contrary, the direct evidence of those two witnesses was sufficient to sustain the finding of the board in that respect. As stated in the case of Leckie Collieries Co. v. Branham, 275 Ky. 748, 122 S. W. 2d 776, the Workmen's Compensation Board is vested with broad discretionary powers, and, in a review of the findings of fact by the board, the only question for our determination is whether there was any evidence of a probative and substantial nature to support such findings.''

It was also contended in that case that the uncontradicted medical evidence showed Marcum's disability could not have been caused by the inhalation of impure air or gas, and, consequently, the claim should have been dismissed. It was held, however, that the inference to be drawn from the sequence of evidence was, to a slight degree at least, contradictory of the medical testimony, and the issue resolved itself to one of facts to be determined by the Board. The facts in the present case are more favorable to the claimants than were the facts in the Marcum case.

The judgment is affirmed.